No. 13-55575

———————————————

UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT

———————————————

MULTI TIME MACHINE, INC.,

Plaintiff /Appellant,

v.

AMAZON.COM, INC. AND AMAZON SERVICES, LLC,

Defendants /Appellees

———————————

Appeal from a Judgment of the
United States District Court
for the Central District of California
Hon. Dean D. Pregerson, No. CV11-09076-DDP (MANx)

———————————————

**BRIEF OF PUBLIC CITIZEN, INC., AND ELECTRONIC FRONTIER
FOUNDATION IN SUPPORT OF REHEARING EN BANC**

Paul Alan Levy
Scott Michelman

Public Citizen Litigation Group
1600 20th Street, N.W.
Washington, D.C. 20009
(202) 588-7725
plevy@citizen.org

July 28, 2015                    Attorney for Amici

## CORPORATE DISCLOSURE STATEMENT

Both proposed amici, Public Citizen and Electronic Frontier Foundation, are non-profit corporations. Neither has a parent corporation, and no publicly traded corporation owns more than 10% of either's stock.


_____/s/  Paul Alan Levy_____

# TABLE OF CONTENTS

Table of Authorities.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . iii

Introduction. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

Interest of Amici Curiae. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

Authorship and Financing. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

Question Presented. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

Argument. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

    I.    The Court Should Grant En Banc Consideration to Consider
        Whether  to Retain the Doctrine of Initial Interest Confusion, as
        Adopted in *Brookfield*, Whose Application Has Become a
        Hopeless Hodgepodge. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

    II.    In the Course of En Banc Review, the Court Should Avoid
        Enthroning in Trademark Law the Majority Opinion's
        Treatment of the *Sleekcraft* Factors and of the Absence of an
        Express Disclaimer of Affiliation. . . . . . . . . . . . . . . . . . . . . . . . . . . 14

Conclusion. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

Certificate of Compliance. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

Certificate of Service. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

# TABLE OF AUTHORITIES

## CASES

*AMF Inc. v. Sleekcraft Boats,*
    599 F.2d 341 (9th Cir. 1979). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

*Au-Tomotive Gold v. Volkswagen of America,*
    603 F.3d 1133 (9th Cir. 2010). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

*Bihari v. Gross,*
    119 F. Supp. 2d 309 (S.D.N.Y. 2000). . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

*Brookfield Commc'ns v. West Coast Entertainment Corp.,*
    174 F.3d 1036 (9th Cir. 1999). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

*Dr. Seuss Enterprises v. Penguin Books USA,*
    109 F.3d 1394 (9th Cir. 1997). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

*Entrepreneur Media v. Smith,*
    279 F.3d 1135 (9th Cir. 2002). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

*Grotrian, Helfferich, Schulz, Th. Steinweg Nachf. v. Steinway & Sons,*
    523 F.2d 1331 (2d Cir. 1975). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

*Hasbro v. Clue Computing,*
    232 F.3d 1 (1st Cir. 2000). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

*Interstellar Starship Serv. v. ePix,*
    304 F.3d 936 (9th Cir. 2002). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 10

*KP Permanent Make-Up v. Lasting Impression I,*
    543 U.S. 111 (2004). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

*Lamparello v. Falwell,*
    420 F.3d 309 (4th Cir. 2005). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8, 12

*Mobil Oil Corp. v. Pegasus Petroleum Corp.*,
  818 F.2d 254 (2d Cir. 1987). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

*Multi Time Mach. v. Amazon.com*,
  2015 WL 4068877 (9th Cir. July 6, 2015). . . . . . . . . . . . . . . . . . . . . . . . . 2

*Network Automation v. Advanced System Concepts*,
  638 F.3d 1137 (9th Cir. 2011). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

*Playboy Enterprises v. Netscape Commc'ns Corp.*,
  354 F.3d 1020 (9th Cir. 2004). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3, 10

*Savin Corporation v. Savin Group*,
  391 F.3d 439 (2d Cir. 2004). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

*Sega Enterprises v. Accolade*,
  977 F.2d 1510 (9th Cir. 1992). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

*Sensient Technologies Corp. v. SensoryEffects Flavor Co.*,
  613 F.3d 754 (8th Cir. 2010). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

*Strick Corp. v. Strickland*,
  162 F. Supp. 2d 372 (E.D. Pa. 2001). . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

*Toyota Motor Sales, U.S.A. v. Tabari*,
  610 F.3d 1171 (9th Cir. 2010). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

*TrafficSchool.com v. Edriver*,
  653 F.3d 820 (9th Cir. 2011). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

**STATUTES**

Lanham Act
  15 U.S.C.§§ 1051 *et seq.*. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 11

**MISCELLANEOUS**

Beebe, *An Empirical Study of the Multifactor Tests for Trademark Infringement,*
    95 Cal. L. Rev. 1581 (2006). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

Beebe, *Search and Persuasion in Trademark Law,*
    103 Mich. L. Rev. 2020 (2005).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

Dogan and Lemley, *Trademarks and Consumer Search Costs on the Internet*,
    41 Houston L. Rev. 177 (2004). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

Goldman, *Deregulating Relevancy in Internet Trademark Law,*
    54 Emory L.J. 507 (2005). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

Lemley & McKenna, *Irrelevant Confusion,*
    62 Stan. L. Rev. 413 (2010). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

Rothman, *Initial Interest Confusion: Standing at the Crossroads of Trademark Law,*
    27 Cardozo L. Rev. 105 (2005). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

**Introduction**

      The pressing need for en banc review to put this Court's caselaw in order can

be succinctly shown by juxtaposing a handful of decisions from the past 16 years:

> Using another's trademark in one's metatags is much like posting a sign
> with another's trademark in front of one's store. Suppose West Coast's
> competitor (let's call it "Blockbuster") puts up a billboard on a highway
> reading—"West Coast Video: 2 miles ahead at Exit 7"—where West
> Coast is really located at Exit 8 but Blockbuster is located at Exit 7.
> Customers looking for West Coast's store will pull off at Exit 7 and
> drive around looking for it. Unable to locate West Coast, but seeing the
> Blockbuster store right by the highway entrance, they may simply rent
> there. . . . [T]he fact that there is only initial consumer confusion does
> not alter the fact that Blockbuster would be misappropriating West
> Coast's acquired goodwill.

*Brookfield Commc'ns v. West Coast Entm't Corp.*, 174 F.3d 1036, 1064
(9th Cir. 1999) (O'Scannlain, J.)

*  *  *

> Upon arriving at ISS's epix.com website, the consumer would not think
> that Epix licensed, sponsored, or owned the ISS website. . . . She would
> simply come to the inevitable and correct conclusion that more than one
> company uses the EPIX name and that Epix operates its website at a
> different address.    Indeed, any consumer looking for Epix, who
> mistakenly guessed that it could be found at www.epix.com, would
> realize in one hot second that she was in the wrong place and either
> guess again or resort to a search engine to locate the Epix site at
> www.epixinc.com.

*Interstellar Starship Serv. v. ePix,* 304 F.3d 936, 946 (9th Cir. 2002)
(Trott, J.) (citation omitted)

*  *  *

When a domain name making nominative use of a mark does not

actively suggest sponsorship or endorsement, the worst that can happen is that some consumers may arrive at the site uncertain as to what they will find. But in the age of FIOS, cable modems, DSL and T1 lines, reasonable, prudent and experienced internet consumers are accustomed to such exploration by trial and error. . . . They skip from site to site, ready to hit the back button whenever they're not satisfied with a site's contents. They fully expect to find some sites that aren't what they imagine based on a glance at the domain name or search engine summary. Outside the special case of trademark.com, or domains that actively claim affiliation with the trademark holder, consumers don't form any firm expectations about the sponsorship of a website until they''ve seen the landing page" if then. This is sensible agnosticism, not consumer confusion.

*Toyota Motor Sales, U.S.A., v. Tabari*, 610 F.3d 1171, 1179 (9th Cir. 2010) (Kozinski, J.), quoted approvingly by Judge Wardlaw in *Network Automation v. Advanced Sys. Concepts*, 638 F.3d 1137, 1152 (9th Cir. 2011) ("We have recently acknowledged that the default degree of consumer care is becoming more heightened as the novelty of the Internet evaporates and online commerce becomes commonplace.").

\* \* \*

Some members of MTM's target demographic, men of 22-55 years of age who like military-styled, rugged products, may not be frequent internet shoppers. Such purchasers "may incorrectly believe that [defendant] licensed [the mark] from [plaintiff].... Other consumers may simply believe that [defendant or the manufacturers it features] bought out [plaintiff], or that they are related companies." [citing *Brookfield*] . . .. Even if further internet research could clarify the matter for a customer who wondered if MTM had been acquired or had acquired its competitor watch-makers, it is incorrect to conclude that likelihood of confusion exists only when consumers are confused as to the source of a product they actually purchase. It is ... well established that the Lanham Act protects against many other forms of confusion.

*Multi Time Mach. v. Amazon.com*, 2015 WL 4068877, at \*7 (9th Cir.

July 6, 2015) (Bea, J.)

\* \* \*

I write separately, however, to express concern that one of those precedents [*Brookfield*] was wrongly decided and may one day, if not now, need to be reconsidered en banc.

\* \* \*

[W]hen the search engine list generated by the search for the trademark ensconced in a metatag comes up, an internet user might choose to visit westcoastvideo.com, the defendant's website in *Brookfield*, instead of the plaintiff's moviebuff.com website, but such choices do not constitute trademark infringement off the internet, and I cannot understand why they should on the internet.

*Playboy Enterprises v. Netscape Commc'ns Corp.*, 354 F.3d 1020, 1034, 1035 (9th Cir. 2004) (Berzon, J., concurring)

**Interest of Amici Curiae**

Public Citizen is a public-interest organization based in Washington, D.C. that has more than 400,000 members and supporters nationwide, about 100,000 of them in the Ninth Circuit. Its counsel have represented many operators of Internet commentary sites and filed many amicus briefs, in this Court and elsewhere, in cases where markholders asserted that the doctrine of initial interest confusion barred the use of trademarks to call web sites to the attention of Internet users.

The Electronic Frontier Foundation ("EFF") is a non-profit civil liberties organization that has worked for more than 20 years to protect consumer interests, innovation, and free expression in the digital world. EFF and its more than 22,000

-3-

dues-paying members have a strong interest in helping the courts and policy-makers strike the appropriate balance between intellectual property and the public interest. As part of its mission, EFF has often served as amicus in trademark cases, including *Radiance Foundation v. N.A.A.C.P.*, 786 F.3d 316 (4th Cir. 2015); *Tiffany (NJ) Inc. v. eBay Inc.*, 600 F.3d 93 (2d Cir. 2010); and *Rescuecom Corp. v. Google Inc.*, 562 F.3d 123 (2d Cir. 2009).

**Authorship and Financing**

This brief was written solely by undersigned counsel, without any participation by counsel for any party. The brief is solely financed by Public Citizen, and no other person (especially no party) contributed money to fund preparing or submitting the brief.

**Question Presented**

Should the holding of *Brookfield Communications*, under which initial interest confusion about the possible sponsorship of a linked web site can be a basis for finding trademark infringement even if there is no likelihood of confusion once the web site itself is viewed, be overruled in light of inter- and intra-circuit disagreement about the validity and implementation of the doctrine?

-4-

**ARGUMENT**

**I.    The Court Should Grant En Banc Consideration to Consider Whether to Retain the Doctrine of Initial Interest Confusion, as Adopted in *Brookfield*, Whose Application Has Become a Hopeless Hodgepodge.**

In this litigation, both parties accepted the doctrine of initial interest confusion: Plaintiff argued that there was sufficient evidence of likely initial confusion to defeat summary judgment, while defendant argued for a narrow construction of that doctrine whereby summary judgment can be affirmed.  Amici contend, however, that the panel that originally adopted the doctrine of initial interest confusion was wrong to do so and that the rule does serious harm to consumers as well as to other aspects of trademark law.  Moreover, this doctrine has proved so unmanageable that circuit precedents discussing the subject are irreconcilable and, hence, vary so much from panel to panel that the outcome of cases raising the issue cannot be predicted by those whose business (or noncommercial griping) involves the use of trademarks.  This Circuit created the problematic doctrine of initial interest confusion; the en banc court should eliminate it, or at least clarify the doctrine so that its scope is clear.

The problem goes back to *Brookfield*, the Court's first major foray into the interplay between trademark law and the various devices for locating web sites of interest.  In *Brookfield*, the parties contested which of them had priority for use of the trademark "MovieBuff" on their respective products, and the parties had briefed only

that issue. In addition to addressing that question, the panel chose to focus its attention on how internet users would react to seeing the trademark in the junior user's domain name and to reaching its web site through a search engine as a result of the inclusion of the trademark in its meta tags, issues that the parties had not addressed in their briefs. Although the panel opinion had antecedents in fragments of Second Circuit decisions, *Grotrian, Helfferich, Schulz, Th. Steinweg Nachf. v. Steinway & Sons*, 523 F.2d 1331 (2d Cir. 1975); *Mobil Oil Corp. v. Pegasus Petroleum Corp.*, 818 F.2d 254 (2d Cir. 1987), as well as *Dr. Seuss Enters. v. Penguin Books USA*, 109 F.3d 1394, 1404 (9th Cir. 1997), the Court's ruling indulged a series of factual assumptions about Internet users and how they perceive Internet sites and search results that had no basis either in the record or in consumer research. *Brookfield* created the doctrine of "initial interest confusion," which permitted a finding of trademark infringement when possible confusion brings an Internet user to a web site even if the user experiences no confusion when making a purchase from a competitor (or, indeed, even if the user makes no purchase at all). 174 F.3d at 1062.

Based perhaps on the unfamiliarity of the judges themselves with the operation of the Internet, and based perhaps with some justification on the newness of the Internet in 1999 and the still-relatively-rudimentary character of devices such as

-6-

search engines whereby Internet users could locate web sites of interest, the *Brookfield* panel took a view of Internet users as fickle and unsophisticated. The majority assumed that any Internet user who enters a trademark into a search engine is necessarily looking for the web site operated by the trademark owner; that if the search engine results display other sites in addition to or instead of the markholders' site, these other search results represent potential "diversions" from what the user must really have been looking for; and that if a competitor's site appears in the search results and is chosen by the user, then the competitor's efforts to secure that user selection represents a form of unfair trickery against which trademark law should protect. The opinion assumed further that if users clicked through to web sites that were not ones that they really wanted, they would either give up and stop searching for the trademark holder's web site, or even make a purchase at a competitor's site. *Id.* at 1063-1065. The opinion drew an analogy between misleading search engine results and a misleading highway sign suggesting that a given business could be visited by using a particular highway exit, when, in fact, it was only a competitor that could be found at that highway access. The majority assumed that the harm incurred as a result of a misleading Internet link is comparable to the harm of the highway sign. *Id.* at 1064. This analysis was unsupported by even a single citation to the record or to any empirical analysis.

*Brookfield* seized on the concept of "initial interest confusion" to address this problem, holding that the non-authorized user of a trademark can be held liable for trademark infringement based on a likelihood of initial interest confusion alone, even if the user never purchases a competitor's goods and even if she purchases competitor goods despite understanding that they **are** from the competitor and not from the trademark user. For several years, the Ninth Circuit and several other courts applied and even expanded this analysis, building up a considerable body of precedent that extended trademark infringement to a variety of circumstances in which Internet users were protected against being exposed to competing products and even to criticisms of the trademark holder in the name of preventing initial confusion. Several other circuits, however, have expressed skepticism about initial interest confusion and have pointedly refused to use it as a rule of decision. *Hasbro v. Clue Computing*, 232 F.3d 1, 2 (1st Cir. 2000); *Lamparello v. Falwell*, 420 F. 3d 309, 316 (4th Cir. 2005); *Sensient Technologies Corp. v. SensoryEffects Flavor Co.*, 613 F.3d 754, 766 (8th Cir. 2010).[1]

---

[1]The Second Circuit, whose decisions in *Grotian* and *Pegasus* provided the grounding for the doctrine of initial interest confusion, has confined the doctrine to cases where the alleged infringer acted with an intent to confuse. *Savin Corporation v. Savin Group*, 391 F.3d 439 (2d Cir. 2004). In that regard, the first of two web pages described in footnote 1 of the majority opinion in this case, if properly considered under a theory of judicial notice even though it is not in the appellate record, is highly suggestive of an intent to confuse. However, the URL indicated in

A rich vein of scholarly literature addresses the flawed assumptions of *Brookfield* and its progeny and questions, indeed, whether that doctrine has been applied consistently or whether it simply serves as a buzzword that gets courts to the destinations they have already chosen in a given case. Beebe, *Search and Persuasion in Trademark Law*, 103 Mich. L. Rev. 2020 (2005); Dogan and Lemley, *Trademarks and Consumer Search Costs on the Internet*, 41 Houston L. Rev. 177 (2004); Goldman, *Deregulating Relevancy in Internet Trademark Law,* 54 Emory L.J. 507 (2005); Lemley & McKenna, *Irrelevant Confusion*, 62 Stan. L. Rev. 413 (2010); Rothman, *Initial Interest Confusion: Standing at the Crossroads of Trademark Law*, 27 Cardozo L. Rev 105 (2005). Even before these articles appeared, several trial courts had questioned the factual assumptions underlying initial interest confusion. Courts recognized that the real-life consequences of landing at the "wrong" website as a result of initial interest confusion were trivial. Even search engine users who have definitive objectives about the web sites that they hope to locate by conducting searches using search engines recognize that the engine will return a range of results, not only on the first page of listings but after that as well, and that not every search engine result will be the page they were hoping to reach; the listing contains those items from the search engine's database that the search engine's ranking algorithm

---

the footnote is no longer active.

designates as being most relevant to the search terms. It is even possible that none of the listings in the page of search results will be the page that the user wants. And if they follow links from the list of results that take them to web pages that are not what they want, they will go back to the search engine, perhaps by using the "back" button on the browser. *E.g.*, *Strick Corp. v. Strickland*, 162 F. Supp.2d 372 (E.D. Pa. 2001); *Bihari v. Gross*, 119 F. Supp.2d 309, 320 n.15 (S.D.N.Y. 2000).

These doubts also began to seep into Ninth Circuit rulings, which articulated factual characterizations about Internet users that contradicted *Brookfield*. For example, in a pair of 2002 decisions, Ninth Circuit panels agreed that Internet users are sophisticated about how the Internet works and that they notice and appreciate the significance of small differences among names and listings. *Interstellar Starship Serv. v. ePix,* 304 F.3d 936, 946 (9th Cir. 2002); *Entrepreneur Media v. Smith*, 279 F.3d 1135, 1147 (9th Cir. 2002). In both cases, the panels indicated that what mattered was whether the web sites themselves were confusing, even though, in both cases, it was domain-name guessing based on the inclusion of a trademark in the domain name that would have drawn Internet users to those pages as a result of a misunderstanding about what might be located at those pages. That mode of analysis cannot be reconciled with the decision below, which holds that the supposedly confusing nature of the page of search results is all that matters regardless of whether

-10-

the pages linked from those results posed any likelihood of confusion. Similarly, Judge Berzon's concurring opinion in *Playboy v. Netscape* includes scathing criticism of *Brookfield*, questioning both the highway sign analogy and ensuing expansive applications of initial interest confusion. 354 F.3d at 1036.

This criticism culminated in the pair of decisions by Judges Kozinski and Wardlaw, cited by Judge Silverman's dissent and quoted in the introduction to this brief, at 1-2, suggesting that initial confusion causes so little harm to the trademark user that it is not worth remedying. These opinions attributed a level of sophistication to Internet users that cannot be reconciled with the characterizations of the majority opinion in this case. In that regard, the majority opinion contains no citation to the record and, so far as amicus' review of the record excerpts revealed, there **is** no support in the appellate record.

Thus, how cases like this get decided in the Ninth Circuit appears to depend on what individual judges perceive about how Internet users interact with search engines. As a result, individuals and companies that post material online that is subject to inclusion in search results, not to speak of the companies that operate search engines, cannot predict the law with sufficient accuracy to minimize exposure to Lanham Act liability. To be sure, defendants like Amazon can afford to defend themselves, but such lawsuits can also be brought against companies that have simply

-11-

endeavored to ensure that their products come to the attention of consumers using the name of a well-known competing product as a search term, not to speak of non-commercial "gripers" whose web sites come up in search results for a trademarked term. When the resources of the two sides are out of balance the notoriously expensive character of trademark litigation, combined with the sponginess of initial interest confusion and the (overstated) argument that summary judgment on likelihood of confusion should rarely be granted, can be weapons to coerce a defendant into submission.

Finally, from a consumer perspective, elevating the doctrine of initial interest confusion to a freestanding basis for finding trademark infringement can be harmful. It enables the owners of trademarks to seek judicial rulings that keep information about competing products, and even criticisms of the trademark holder and its products, out of search engine listings where consumers can find them. However, such information might be just as useful to search engine users as the information found on the trademark owner's own web site; it might even be what the search engine users hoped to find. Even hypothesizing that the only reason why **some** people use a trademark as a search term is that they hope to find the trademark user's product and buy it, other users might recognize the trademarked name as an example of a product that they want but be perfectly content to find and buy competing

products of the same type that are better, or cheaper, or more readily accessible. Still other users might want to obtain information about the trademark holder so that they can assess its desirability, or find others who are unhappy about the product and make common cause with them. For example, in the early years of the Internet, trademark holders consistently invoked the concept of initial interest confusion as a basis for preventing gripe sites from coming to the attention of Internet users, thus making it harder for Internet users to obtain negative information about the brand and its owner. Since the Fourth Circuit's decision in *Lamparello* that confusion must be judged in light of the contents of the underlying web site, 420 F.3d at 318, these arguments have become less frequent. Unfortunately, by breathing new life into the initial interest doctrine, this decision may revive such disputes, to the detriment of consumers.

Trademark law's social justification is to protect consumers from being misled about the identity of purveyors of commercial information. Consequently, trademark law needs to accommodate the many different reasons for using search engines. Accommodating careless Internet users who don't pay attention to small differences, and who are too lazy to use the "back" button on their browsers when they reach the wrong location, can mean suppressing access to useful information that other search engine users want. And if trademark law is subverted to that end, trademark law is

-13-

not serving the interests of consumers at large; it is accommodating a few (and accommodating trademark owners who want to suppress information) but hurting the many. Considering how trivial the consequences of initial interest confusion are (even if its occurrence had empirical support), it is hard to see why trademark law should suppress access to useful information when the harm to consumers is so small.

Rather than continuing the effort to patch up the doctrine of initial interest confusion and trying to effect a reconciliation of the Court's various conflicting panel opinions on the subject, as Amazon argues, amici urge that the game is not worth the candle. The Court should overrule *Brookfield*, at least absent persuasive evidence of intent to confuse.

## II. In the Course of En Banc Review, the Court Should Avoid Enthroning in Trademark Law the Majority Opinion's Treatment of the *Sleekcraft* Factors and the Absence of an Express Disclaimer of Affiliation.

The majority opinion's initial interest confusion analysis is sufficient reason to grant en banc review in this case. In the event en banc consideration is granted, the Court should address two additional issues.

First, unlike the majority opinion, which addressed the initial interest confusion issues through the prism of the multi-factor likelihood-of-confusion analysis provided by *AMF Inc. v. Sleekcraft Boats*, 599 F.2d 341, 346 (9th Cir. 1979), Judge Silverman's dissent questions applying the *Sleekcraft* factors at all. Slip Op. 27-28.

-14-

He argued both that the appellate court should focus on the appearance of the Internet search pages, and that the *Sleekcraft* test was designed to help courts parse out cases in which the litigants were contending over two different trademarks for related products.

Judge Silverman has the better of this argument. Indeed, recent scholarship casts substantial doubt on the utility of multi-factor analyses such as *Sleekcraft*. Barton Beebe's *An Empirical Study of the Multifactor Tests for Trademark Infringement*, 95 Cal. L. Rev. 1581 (2006), suggests that courts apply multi-factor analyses in a highly result-oriented fashion, first deciding whether there is a likelihood of confusion and then manipulating the factors in a number of highly predictable ways so that the analysis supports the panel's a priori conclusions. Consequently, amici urge the Court not to treat the *Sleekcraft* factors as a trademark analog of the Four Questions, that a trademark court must ask and answer if it is to be accounted praiseworthy.

Second, the court below phrased the legal question at the heart of this case as being "MTM['s] conten[tion] that Amazon is obliged to inform the consumer that Amazon does not carry any products with that brand before offering products from other brands in order to avoid confusing the consumer [as against] Amazon['s argument] that so long as Amazon labels the search results clearly as being from

different brands, consumers will get what they want from their searches and Amazon will not have infringed on MTM's trademark." ER 8-9.  MTM's brief to the panel repeatedly embraced this characterization of the legal issue, contending that what Amazon needed to do to secure itself against a trademark infringement claim was to post a clear disclaimer on its listing of search results specifying that none of the sales pages hyperlinked from that page displayed an MTM branded watch.

Amici agree that disclaimers can play a significant role in dispelling demonstrated consumer confusion, *e.g.*, *Au-Tomotive Gold v. Volkswagen of Am.*, 603 F.3d 1133, 1138 (9th Cir. 2010), *Sega Enterprises v. Accolade*, 977 F.2d 1510, 1529 (9th Cir. 1992), and that trademark injunctions often include the requirement of posting conspicuous disclaimers.  *E.g. TrafficSchool.com v. Edriver*, 653 F.3d 820, 824 (9th Cir. 2011).  But that does not mean that the **absence** of such a disclaimer is probative evidence of likely confusion.  The majority repeatedly treated the absence of a clear disclaimer as general evidence of likely confusion, and inferred intent to confuse from the failure to provide a disclaimer.  But plaintiff has the burden of proof on the issue of likely confusion,  *KP Permanent Make-Up v. Lasting Impression I*, 543 U.S. 111, 118 (2004); that burden should not shifted to the defendant by requiring it to prove that it has an effective disclaimer.

Indeed, the disclaimer on which plaintiff and the majority insisted would have

-16-

been inaccurate, because the search listing in the appellate record (ER 253) includes, in addition to the eight watches and two books included among the search results in the middle of the page, the following "sponsored link" at the bottom of the page:

Tactical Watches by MTM  MTM Tactical Watches Worn by Military Police Sportsmen  www.specialopswatch.com

Following the provided link takes the viewer to one of plaintiff's own web sites, where various of plaintiff's watches are offered for sale. Amazon should not be faulted for having failed to post a false disclaimer.

## CONCLUSION

The petition for rehearing en banc should be granted. Because the parties wrote their briefs on the assumption that all circuit precedent was binding, and because of the wide-ranging ramifications of the issues presented, the Court should give the parties the opportunity to file new briefs.

Respectfully submitted,

_____/s/  Paul Alan Levy_____
Paul Alan Levy
Scott Michelman

Public Citizen Litigation Group
1600 20th Street, N.W.
Washington, D.C. 20009
(202) 588-7725
plevy@citizen.org

-17-

July 29, 2015                                    Attorneys for Amici Curiae

## CERTIFICATE OF COMPLIANCE

The foregoing brief was prepared using Word Perfect X7 in 14 point Times Roman type.  Word Perfect counted 4178 words in the brief.

_____/s/ Paul Alan Levy_____

**CERTIFICATE OF SERVICE**

On this date, I filed the proposed amicus brief of Public Citizen, Inc. and Electronic Frontier Foundation in Multi Time Machine, Inc. v. Amazon.com *et al.*. No. 13-55575, through the Court's ECF system, which will effect service on all parties electronically.

July 28, 2015                          /s/ Paul Alan Levy