No. 13-55575
_____

IN THE UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT
_____

MULTI TIME MACHINE, INC.
Plaintiff-Appellant,

v.

AMAZON.COM, INC. AND AMAZON SERVICES LLC,
Defendant-Appellees.
_____

On Appeal from the United States District Court
for the Central District of California
Case No. 11-cv-09076-DDP (MANx)
Hon. Dean D. Pregerson
_____

**BRIEF OF GOOGLE INC., PINTEREST, INC., YAHOO! INC., eBAY INC.,
AND TWITTER, INC. AS AMICI CURIAE SUPPORTING
AMAZON'S PETITION FOR REHEARING EN BANC**
_____

MARGRET M. CARUSO
CAROLYN HOMER THOMAS
QUINN EMANUEL URQUHART &
SULLIVAN LLP
555 Twin Dolphin Drive, 5th Floor
Redwood Shores, CA 94065
(650) 801-5000

July 30, 2015                    *Counsel for Amici Curiae*

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1, counsel for Amici certifies that none of them—Google Inc., Pinterest, Inc., Yahoo! Inc., eBay Inc., and Twitter, Inc.—has any parent corporation, and no publicly held corporation owns 10 percent or more of any of Amici's stock.

## STATEMENT OF INTERESTS[1]

Amici Curiae Google, Pinterest, Yahoo, eBay, and Twitter are among the largest and best-known Internet companies in America. They collectively file this brief to provide perspective on how their services depend upon dynamically evolving search features, and how the majority opinion's assumptions regarding online consumer perception will likely affect their businesses. Like Amazon, the Amici are deeply invested in providing information in response to user queries, including retail purchase information and advertising. Some of the Amici compete with Amazon, and with each other, but given the issues at stake in this appeal they unanimously urge the Court to grant Amazon's petition for rehearing en banc.

Founded in 1998, **Google Inc.** is a leading search engine and provides a wide range of services that empower millions of people around the world to find, create, and communicate information. Google's search technology and AdWords programs have been central to dozens of court cases that have helped to define the parameters of trademark confusion on the Internet.

---

[1] Pursuant to Federal Rule of Appellate Procedure 29(c)(5), counsel for Amici represent that they authored this brief in its entirety and that none of the parties or their counsel, nor any other person or entity other than Amici or their counsel, made a monetary contribution intended to fund the preparation or submission of this brief. A Motion For Leave To File has been filed concurrent with this brief pursuant to Federal Rule of Appellate Procedure 29(a).

**Pinterest, Inc.** is an online platform that allows people to save visual bookmarks, discover new things, and engage with the people who create them. Users save images and information about the objects in them as "Pins" from their own collections or from across the web, and organize those Pins in themed collections called boards. As users browse the millions of boards and more than 50 billion Pins available on Pinterest, they can Pin the content they find onto their own boards and follow the users and boards they find most useful, inspiring, or interesting. Last year, Pinterest introduced "guided search"—a tool designed to build serendipity into the search process by helping users find both things they're looking for, and things they wouldn't have thought of.

Founded in 1994 by two Stanford PhD candidates, **Yahoo! Inc**. operates one of the most trafficked Internet destinations in the world and attracts hundreds of millions of users every month through its engaging media, content, and communications offerings. Yahoo aims to deliver deeply personalized digital experiences using technology, insights based on data, and intuition to bring together personally relevant content and experiences from across the Web. Yahoo is focused on making the world's daily habits inspiring and entertaining—whether searching the web, emailing friends, sharing photos with family, or simply checking the weather, sports scores, or stock quotes. Yahoo keeps people connected to what matters most to them, across devices and around the world.

**eBay Inc.**, with 157 million active buyers globally and more than 800 million items listed for sale, is one of the world's largest online marketplaces, where practically anyone can buy and sell practically anything. The ability for buyers and sellers to search the eBay site is critically important to the success of eBay's marketplace.

**Twitter, Inc.** is a global platform, founded in 2006, for public self-expression and conversation in real time. The Twitter platform gives everyone the power to share ideas and information instantly, without barriers. Twitter has more than 316 million monthly active users creating approximately 500 million Tweets every day. Twitter's search and hashtag features are used by millions of brands to interact with consumers, including by providing promotional content, responding to consumer concerns, and monitoring real-time consumer sentiment.

## <u>TABLE OF CONTENTS</u>

<u>Page</u>

CORPORATE DISCLOSURE STATEMENT ...........................................................i

STATEMENT OF INTERESTS ................................................................ ii

PRELIMINARY STATEMENT.................................................................1

ARGUMENT ...................................................................................2

    I.    EN BANC REVIEW IS NECESSARY TO CORRECT THE
        MAJORITY'S ILL-ADVISED RELIANCE ON
        *BROOKFIELD* IN REVITALIZING INITIAL INTEREST
        CONFUSION ...........................................................2

        A.    Modern Use Of The Internet Is Far More Sophisticated
                Than It Was In 1999, When *Brookfield* Was Decided ...............4

        B.    Others Circuits Have Distanced Themselves From The
                *Brookfield* Decision And Declined To Adopt Its
                Expansive View of Initial Interest Confusion............................7

        C.    This Court Has Moved Away from *Brookfield*'s
                Reasoning.............................................................9

    II.    EN BANC REVIEW IS NECESSARY TO ESTABLISH THAT
        THE LEGAL THEORY OF INITIAL INTEREST
        CONFUSION CANNOT SUBSTITUTE FOR PLAINTIFF'S
        EVIDENTIARY BURDEN AT SUMMARY JUDGMENT ..............12

    III.    EN BANC REVIEW IS NECESSARY TO CLARIFY THE
        USE IN COMMERCE REQUIREMENT ..........................................15

CONCLUSION ...................................................................................17

CERTIFICATE OF COMPLIANCE WITH RULE 32(a) .......................................18

CERTIFICATE OF SERVICE .................................................................19

v

# TABLE OF AUTHORITIES

**Page**

*Ascentive, LLC v. Opinion Corp.*,
842 F. Supp. 2d 450 (E.D.N.Y. 2011) ................................................................9

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009)...........................................................................................15

*Brookfield Communications, Inc. v. West Coast Entertainment Corp.*,
174 F.3d 1036 (9th Cir. 1999) .....................................................................*passim*

*Cafasso, U.S. ex rel. v. Gen. Dynamics C4 Sys., Inc.*,
637 F.3d 1047 (9th Cir. 2011) ..........................................................................12

*Carl v. BernardJcarl.Com*,
409 F. App'x 628 (4th Cir. 2010) ........................................................................8

*Checkpoint Sys., Inc. v. Check Point Software Techs., Inc.*,
269 F.3d 270 (3d Cir. 2001) ..............................................................................13

*EarthCam, Inc. v. OxBlue Corp.*,
49 F. Supp. 3d 1210 (N.D. Ga. 2014)................................................................13

*Fancaster, Inc. v. Comcast Corp.*,
832 F. Supp. 2d 380 (D.N.J. 2011)......................................................................9

*Gen. Steel Domestic Sales, LLC v. Chumley*,
2013 WL 1900562 (D. Colo. May 7, 2013) ......................................................13

*Groeneveld Transp. Efficiency, Inc. v. Lubecore Int'l, Inc.*,
730 F.3d 494 (6th Cir. 2013) .............................................................................12

*Hamzik v. Zale Corp.*,
3:06-cv-1300, 2007 U.S. Dist. LEXIS 28981 (N.D.N.Y. April 19, 2007).........16

*J.G. Wentworth, S.S.C. L.P. v. Settlement Funding LLC,*
06-c 2007 WL 30115 (E.D. Pa. Jan. 4, 2007)......................................................9

*M2 Software, Inc. v. Madacy Entm't*,
421 F.3d 1073 (9th Cir. 2005) ...........................................................................11

*Multi Time Mach., Inc. v. Amazon.com, Inc.*,
No. 13-55575, 2015 WL 4068877 (9th Cir. July 6, 2015) ...................................4

*Multi Time Mach., Inc. v. Amazon.com*,
926 F. Supp. 2d 1130 (C.D. Cal. 2013) .............................................................13

*Network Automation, Inc. v. Advanced Sys. Concepts, Inc.*
638 F.3d 1137 (9th Cir. 2011) ......................................................................6, 10

*Perfect 10, Inc. v. Amazon.com, Inc.*,
    508 F.3d 1146 (9th Cir. 2007) ...................................................................2

*Playboy Enters., Inc. v. Netscape Commc'ns Corp.*,
    354 F.3d 1020 (9th Cir. 2004) ..........................................................1, 9, 13

*Sensient Technologies Corp. v. SensoryEffects Flavor Co.*,
    613 F.3d 754 (8th Cir. 2010) .................................................................8, 13

*Simon Property Grp. L.P. v. mySimon, Inc.*,
    104 F. Supp. 2d 1033 (S.D. Ind. 2000) ....................................................9

*Suntree Technologies, Inc. v. Ecosense Int'l*,
    693 F.3d 1338 (11th Cir. 2012) .............................................................8, 13

*Toyota Motor Sales, U.S.A., Inc. v. Tabari*,
    610 F.3d 1171 (9th Cir. 2010) .............................................................10, 14

*Vail Associates, Inc. v. Vend-Tel-Co.*,
    516 F.3d 853 (10th Cir. 2008) ..............................................................12

## Statutes

Fed. R. Civ. P. 56(a) ..............................................................................15

Federal Rule of Appellate Procedure 32(a)(5), (a)(6),(B) ......................18

Rule 32(a)(7)(B)(iii) .............................................................................18

## Miscellaneous

4 J. Thomas McCarthy, *McCarthy on Trademarks* ................................12

comScore, *comScore Ranks the Top 50 U.S. Digital Media Properties for
    June 2015* (July 24, 2015), available at
    http://www.comscore.com/Insights/Market-Rankings/comScore-Ranks-
    the-Top-50-US-Digital-Media-Properties-for-June-2015. ...................6

comScore, *Cyber Monday Exceeds $2 Billion in Desktop Sales for First
    Time Ever to Rank as Heaviest U.S. Online Spending Day in History*
    (Dec. 2, 2014), available at https://www.comscore.com/Insights/Press-
    Releases/2014/12/Cyber-Monday-Exceeds-2-Billion-in-Desktop-Sales-
    for-First-Time-Ever-to-Rank-as-Heaviest-US-Online-Spending-Day-in-
    History...................................................................................................7

Google.com Press Release, *Google Receives $25 Million in Equity Funding*
    (June 7, 1999), available at
    http://googlepress.blogspot.com/1999/06/google-receives-25-million-in-
    equity.html ...........................................................................................5

*Jennifer E. Rothman, Initial Interest Confusion: Standing at the Crossroads
    of Trademark Law,* 27 Cardozo L. Rev. 105 (2005) ...........................8

Joan E. Rigdon, The Wall Street Journal, *Yahoo! IPO Soars in First Day, But Honeymoon May Not Last*, (Apr. 15, 1996), available at http://www.wsj.com/articles/SB849504268462964500 .......................................5

*Michael Grynberg, Trademark Litigation As Consumer Conflict,* 83 N.Y.U. L. Rev. 60 (2008) ...............................................................7

Pew Research Center, *Technology in the American Household: Americans Going Online … Explosive Growth, Uncertain Destinations* (Oct. 16, 1995) available at http://www.people-press.org/files/legacy-pdf/136.pdf. ..........5

Pew Research Center, *The Web at 25 in the U.S.* (Feb. 27, 2014) available at http://www.pewInternet.org/2014/02/25/the-web-at-25-in-the-u-s. ...................4

*Stacey L. Dogan & Mark A. Lemley, Trademarks and Consumer Search Costs on the Internet,* 41 Hous. L. Rev. 777 (2004)...........................................8

The Third Branch, *Ten Courts of Appeals Move to CM/ECF* (May 2006) available at http://issuu.com/uscourts/docs/2006-05-may. ..................................6

## PRELIMINARY STATEMENT

In the middle of the dot-com boom of the late 1990s, this Court decided *Brookfield Communications, Inc. v. West Coast Entertainment Corp.*, 174 F.3d 1036 (9th Cir. 1999). *Brookfield* held that the defendant's competitive use of trademarks in website keywords and metatags was likely to create "initial interest confusion" on the Internet. Academics criticized the decision as overbroad; courts nationwide declined either to adopt the doctrine or to apply its reasoning to Internet search; and subsequent panels of this Court narrowed its effect based on the modern realities of consumer Internet use. By resurrecting *Brookfield*'s preliminary injunction holding, the majority opinion in *Multi Time Machine v. Amazon* is at odds with the weight of reasoned authority both inside and outside this Circuit. More than a decade ago, Judge Berzon expressed concern that *Brookfield* was "wrongly decided and may one day, if not now, need to be reconsidered *en banc*." *Playboy Enters., Inc. v. Netscape Commc'ns Corp.*, 354 F.3d 1020, 1034 (9th Cir. 2004) (Berzon, J., concurring). Amici, as industry leaders in Internet search and e-commerce, respectfully submit that time has come.

To the extent initial interest confusion can apply to Internet search, *proof* that such confusion is *likely* is still necessary to defeat summary judgment. In the absence of such proof, the majority erred in reversing the grant of summary judgment. A mere possibility of confusion by an unsophisticated consumer does

1

not excuse a plaintiff's burden. En banc review is necessary to confirm that asserting an initial interest theory does not switch the burden to the defendant to disprove *any* possibility of confusion; the burden remains on the plaintiff to establish that confusion, initial interest or otherwise, is likely.

Finally, en banc review should be granted to void the majority's new precedent that a consumer's own search activities constitute a use in commerce of a trademark by the technology company that offers the search tool. This novel interpretation of the Lanham Act would create endless litigation potential based on any consumer inquiry on the Internet that includes a trademark.

No less in trademark than in copyright, commercial search tools "provide great value to the public." *Perfect 10, Inc. v. Amazon.com, Inc.*, 508 F.3d 1146, 1166 (9th Cir. 2007). Absent clarification or correction of the majority opinion, Amici fear a wave of frivolous litigation untethered from market realities. Trademark law should not chill innovation by unnecessarily restricting information about what competitive choices may appear in Internet user search results, particularly when plaintiffs can offer no evidence of likely confusion or harm.

## ARGUMENT

I. **EN BANC REVIEW IS NECESSARY TO CORRECT THE MAJORITY'S ILL-ADVISED RELIANCE ON *BROOKFIELD* IN REVITALIZING INITIAL INTEREST CONFUSION**

In early 1999, the Ninth Circuit heard a preliminary injunction appeal in one

2

of the nation's first significant Internet law cases: *Brookfield Communications, Inc. v. West Coast Entertainment Corp.,* 174 F.3d 1036. Recognizing that it had not yet applied "the likelihood of confusion analysis in the Internet context," *id.* at 1054 n. 16, the Court "provide[d] a general overview of the relevant technology"—without reference to any record cites, *id.* at 1044-45. The Court explained that search engines "such as Yahoo, Altavista, or Lycos," return website results based on a "self-created index" of "keywords" and "metatags." *Id.* at 1045.

Reversing denial of a preliminary injunction motion, *Brookfield* found a likelihood of confusion and concluded that West Coast should be preliminarily enjoined both from offering its entertainment database at the moviebuff.com domain name and from "using marks confusingly similar to 'MovieBuff' in metatags and buried code." *Id.* at 1061. The Court reasoned that West Coast's inclusion of "MovieBuff" in metatags would elevate its website in keyword indices and search engine results, which would result in "initial interest confusion" by consumers. *Id.* at 1062. Even though click-through consumers would actually know "they are patronizing West Coast rather than Brookfield," *Brookfield* reasoned that West Coast would have nevertheless "improperly benefit[ted] from the goodwill that Brookfield developed in its mark." *Id.* at 1062. The Court then broadly held that "using a competitor's trademark in the metatags of such web site is likely to cause what we have described as initial interest confusion." *Id.* at 1066.

3

Over the last 16 years, the holdings in *Brookfield* have been steadily limited. Yet earlier this month, a majority of the panel in the case at bar relied heavily on *Brookfield* in reversing summary judgment for Amazon. It ruled that "an Amazon customer who searches for 'MTM Special Ops' and then investigates watches manufactured by Luminox or Chase–Durer, even if he later purchases such a watch without any confusion as to its source, will have been subject to 'confusion.[']" *Multi Time Mach., Inc. v. Amazon.com, Inc.*, No. 13-55575, 2015 WL 4068877, Amazon's Addendum ("ADD") 18, (9th Cir. July 6, 2015).

Because the majority did not account for the increased consumer familiarity with sophisticated technologies that have emerged since *Brookfield* was decided in 1999, en banc review is needed. To provide the best services and most relevant results for the American public, Internet retailers and advertisers such as Amici should not face trial simply for returning clearly labeled search results.

## A. Modern Use Of The Internet Is Far More Sophisticated Than It Was In 1999, When *Brookfield* Was Decided

*Brookfield* was decided around the time the Internet was becoming mainstream. Amazon and eBay each launched in late 1995, when only 14 percent of American adults used the Internet.[2] The Pew Research Center remarked at the

---

[2] Susannah Fox and Lee Rainee, *The Web at 25 in the U.S.*, Pew Research Center, 4 (Feb. 27, 2014), http://www.pewinternet.org/files/2014/02/PIP_25th-anniversary-of-the-Web_0227141.pdf.

time, "Consumers have yet to begin purchasing goods and services online."[3] And in response to Yahoo's successful initial public offering in 1996, *The Wall Street Journal* skeptically observed that "investors are still gaga over virtually anything related to the Internet" even though "there is no assurance that the Web will ever drive large amounts of advertising dollars."[4]

By 1999 only a third of all Americans used the Internet, and only 13 percent engaged in online shopping.[5] That year, a start-up called Google had just received its first significant media attention and major round of funding.[6]

------------------------

[3] Andrew Kohut, Carol Bowman, and Margaret Petrella, *Technology in the American Household: Americans Going Online … Explosive Growth, Uncertain Destinations*, Pew Research Center, 1 (Oct. 16, 1995), *available at* http://www.people-press.org/files/legacy-pdf/136.pdf.

[4] Joan E. Rigdon, *Yahoo! IPO Soars in First Day, But Honeymoon May Not Last*, The Wall Street Journal (last updated Apr. 15, 1996), http://www.wsj.com/articles/SB849504268462964500.

[5] *See* Fox and Rainee, *supra* note 2, at 4; Jonathan L. Willis, *What Impact Will E-Commerce Have on the U.S. Economy*, Federal Reserve Bank of Kansas City, 56 (2nd Quarter 2004) (citing Commerce Department research), https://www.kansascityfed.org/publicat/Econrev/PDF/2q04will.pdf.

[6] Discussion of Google! Search Engine in *Tour of Top 100 Websites*, PC Magazine Online (December 1998), http://web.archive.org/web/19991009101757/http://www.zdnet.com/pcmag/special/web100/search2.html. ("[T]he site has an uncanny knack for returning extremely relevant results. There's much more to come at Google!, but even in its prototype form it's a great search engine."); Press Release, Google.com, Google Receives $25 Million in Equity Funding (June 7, 1999), *available at* http://googlepress.blogspot.com/1999/06/google-receives-25-million-in-equity.html.

Other modern Internet companies wouldn't launch for several years. Facebook first formed a small college network in 2004. Twitter started in 2006. Pinterest debuted in 2010. And in 2006, the Ninth Circuit began accepting e-filings.[7]

Today, more than 80% of Americans use the Internet every single day, and essentially all of them shop online.[8] As this Court recognized four years ago, the "novelty of the Internet" was already "evaporat[ing]" and online commerce was becoming "commonplace." *Network Automation, Inc. v. Advanced Sys. Concepts, Inc.,* 638 F.3d 1137, 1152 (9th Cir. 2011). In June 2015 alone, at least twice as many Americans used Google (242 million), Facebook (214 million), Yahoo (209 million), and Amazon (182 million) as used the Internet at all in 1999 (94 million).[9] Through years of experience, consumers have become accustomed to running searches on a variety of platforms, being presented with a wide variety of content,

---

[7] *Ten Courts of Appeals Move to CM/ECF*, The Third Branch, May 2006, at 4, *available at* http://issuu.com/uscourts/docs/2006-05-may.

[8] *See* Fox and Rainee, *supra* note 2, at 4, 5, 31; Cooper Smith, *The surprising facts about who shops online and on mobile*, Business Insider, (Feb. 23, 2015, 8:01AM), http://www.businessinsider.com/the-surprising-demographics-of-who-shops-online-and-on-mobile-2014-6.

[9] *comScore Ranks the Top 50 U.S Digital Media Properties for June 2015*, comScore (July 24, 2015), http://www.comscore.com/Insights/Market-Rankings/comScore-Ranks-the-Top-50-US-Digital-Media-Properties-for-June-2015. Consumers also used eBay (126 million), Twitter (116 million), and Pinterest (76 million) extensively.

and refining their requests. Despite *The Wall Street Journal*'s early doubt, online sales and advertising caught on and are still experiencing rapid and massive growth. Last year's Cyber Monday ranks as the heaviest online shopping day in U.S. history, with more than $2 billion in sales.[10]

The considerable investments Internet leaders have made in serving American consumers underlie this success. Web design is constantly studied and revised, and user interfaces and search algorithms have improved dramatically over the past 16 years to better present users with search results they might find helpful. The majority opinion in *MTM v. Amazon* ignores this market dynamism, i.e., the rapid innovation by companies and ever-increasing engagement by Internet consumers since *Brookfield*. Amici respectfully request that the Ninth Circuit grant en banc review to set realistic, market-based legal standards for Internet queries involving trademarks, while not stifling either innovation in search technology or the competitive commercial choices available to Internet consumers.

### B. Others Circuits Have Distanced Themselves From The *Brookfield* Decision And Declined To Adopt Its Expansive View of Initial Interest Confusion

*Brookfield* has been frequently criticized since it issued. *See, e.g.,* Michael

---

[10] *Cyber Monday Exceeds $2 Billion in Desktop Sales for First Time Ever to Rank as Heaviest U.S. Online Spending Day in History*, comScore (Dec. 2, 2014), https://www.comscore.com/Insights/Press-Releases/2014/12/Cyber-Monday-Exceeds-2-Billion-in-Desktop-Sales-for-First-Time-Ever-to-Rank-as-Heaviest-US-Online-Spending-Day-in-History.

7

Grynberg, *Trademark Litigation As Consumer Conflict,* 83 N.Y.U. L. Rev. 60, 86 (2008) ("*Brookfield* and its progeny have been heavily criticized for expanding initial interest confusion doctrine into Internet cases in which the case for any consumer harm is doubtful."). Commentators have been particularly critical of *Brookfield*'s unsupported presumptions of possible confusion from metatags, "without examining any evidence of how the metatags affected actual search results or whether any single consumer was ever actually misled." Stacey L. Dogan & Mark A. Lemley, *Trademarks and Consumer Search Costs on the Internet*, 41 Hous. L. Rev. 777, 816 (2004); *see also* Jennifer E. Rothman, *Initial Interest Confusion: Standing at the Crossroads of Trademark Law*, 27 Cardozo L. Rev. 105 (2005).

Many other circuits have either declined to recognize initial interest confusion altogether, or readily rejected its application. *See, e.g., Suntree Techs., Inc. v. Ecosense Int'l Inc.*, 693 F.3d 1338, 1347 (11th Cir. 2012) ("[W]e need not reach the question whether initial interest confusion is actionable in the Eleventh Circuit."); *Carl v. BernardJcarl.Com*, 409 F. App'x 628, 630 (4th Cir. 2010) ("[T]his court has rejected the 'initial interest confusion' doctrine in trademark cases."); *Sensient Techs. Corp. v. SensoryEffects Flavor Co.*, 613 F.3d 754, 764 (8th Cir. 2010) (noting "that [the initial interest confusion] theory has never been adopted by the Eighth Circuit"). And several courts, while recognizing that initial

interest confusion may be actionable generally, have refused to apply the doctrine to keywords and Internet search results.[11]

### C. This Court Has Moved Away from *Brookfield*'s Reasoning

As early as 2004, Judge Berzon expressed that *Brookfield was* "wrongly decided" and called for reconsideration en banc of its holding. *Playboy*, 354 F.3d at 1034-35 (concurring opinion). As she explained:

> [It is not] reasonable to find initial interest confusion when a consumer is never confused as to source or affiliation, but instead knows, or should know, from the outset that a product or web link is not related to that of the trademark holder because the list produced by the search engine so informs him.

*Id.* Judge Berzon did not call for the defendant to use a disclaimer of affiliation, but merely to have the ad at issue "labeled or otherwise identified." *Id.* at 1036.

Netscape did not seek further review of the *Playboy* decision, and the Ninth Circuit has not otherwise had occasion to subject *Brookfield* to en banc

---

[11]  *See, e.g., Ascentive, LLC v. Opinion Corp.*, 842 F. Supp. 2d 450, 467-69 (E.D.N.Y. 2011) (finding no initial interest confusion at preliminary injunction stage); *Fancaster, Inc. v. Comcast Corp.*, 832 F. Supp. 2d 380, 414 (D.N.J. 2011) (search engine results "not probative of initial interest confusion" for summary judgment); *J.G. Wentworth, S.S.C. L.P. v. Settlement Funding LLC,* No. 06–cv–597, 2007 WL 30115, at *7–8 (E.D. Pa. Jan. 4, 2007) (granting motion to dismiss because search engine results merely present "the many choices for the potential consumer to investigate"); *Simon Property Grp. L.P. v. mySimon, Inc.,* 104 F. Supp. 2d 1033, 1044 (S.D. Ind. 2000) (excluding expert surveys under *Daubert* because "[a]ny Internet user is familiar with the confusion one confronts with such a welter of search results, but that confusion is the uncertainty about where to go next, not necessarily the confusion that is relevant for purposes of trademark law.").

reconsideration. But until the majority's decision here, the Court had steadily constricted *Brookfield*'s application since *Playboy*. In a 2010 opinion written by then-Chief Judge Kozinski, the Court explained that when a website "does not *actively* suggest sponsorship or endorsement" by a trademark owner, "the worst that can happen is that some consumers may arrive at the site uncertain as to what they will find." *Toyota Motor Sales, U.S.A., Inc. v. Tabari*, 610 F.3d 1171, 1179 (9th Cir. 2010).[12] This is because Internet "consumers don't form any firm expectations about the sponsorship of a website until they've seen the landing page—if then." *Id.* "This is sensible agnosticism, not consumer confusion." *Id.*

The next year, another Ninth Circuit panel even more explicitly distanced itself from *Brookfield.* Invoking Judge Berzon's *Playboy* concurrence, the Court explained that "it would be wrong to expand the initial interest confusion theory of infringement beyond the realm of the misleading and deceptive to the context of legitimate comparative and contextual advertising." *Network Automation*, 638 F.3d at 1148.

*     *     *

The *MTM* majority acknowledged that Amazon returns "clearly labeled" itemized listings for competitor products, none of which mention the plaintiff's trademark at all. ADD 13. Under *Tabari* and *Network Automation*, this compelled

---

[12] All emphasis herein is supplied unless otherwise noted.

10

judgment against the plaintiff. Nevertheless, the majority relied on *Brookfield* to reverse summary judgment because a consumer who searches for MTM Special Ops watches, but sees Luminox watches instead, *might* possibly be confused. *Id*. *Cf. M2 Software, Inc. v. Madacy Entm't*, 421 F.3d 1073, 1085 (9th Cir. 2005) ("To prevail on the ultimate question"—the likelihood of confusion of consumers—a plaintiff "must show sufficient evidence to permit a rational trier of fact to find that confusion is 'probable,' not merely 'possible.'"). Amici are concerned that the majority's analysis fails to reconcile nascent Internet case law with modern consumer realities. In Amici's experience, both consumers and competition benefit when search results offer more information and choices.

Applying *Brookfield*'s framework and antiquated technology to retail searches in 2015 risks chilling the dynamic Internet retail market, with which consumers are now quite familiar. Constraining technology companies from showing results that might not perfectly match a consumer query would render Internet transactions far more rigid than brick and mortar ones and would deny consumers the flexibility they have come to expect from their online experiences, both commercial, social, and otherwise. Amici respectfully submit that now is the time to accept Judge Berzon's invitation to reconsider en banc, and to reject, *Brookfield*'s initial interest confusion analysis as applied to Internet search results.

11

**II.    EN BANC REVIEW IS NECESSARY TO ESTABLISH THAT THE LEGAL THEORY OF INITIAL INTEREST CONFUSION CANNOT SUBSTITUTE FOR PLAINTIFF'S EVIDENTIARY BURDEN AT SUMMARY JUDGMENT**

In vacating summary judgment, the *MTM* majority misapplied the summary judgment standard, which requires non-moving plaintiffs to "set forth non-speculative evidence of specific facts, not sweeping conclusory allegations." *Cafasso, U.S. ex rel. v. Gen. Dynamics C4 Sys., Inc.*, 637 F.3d 1047, 1061 (9th Cir. 2011) (affirming grant of summary judgment).    Where plaintiff's evidence "establishes only that this set of events could conceivably have occurred[,] it does not give rise to a reasonable inference that it did in fact occur.  To find liability on this evidence would require undue speculation."  *Id.*

The law is not different for initial interest confusion.  "Simply invoking the term 'initial-interest confusion' does not state a viable claim, let alone create a triable issue of fact."  *Groeneveld Transp. Efficiency, Inc. v. Lubecore Int'l, Inc.*, 730 F.3d 494, 519 (6th Cir. 2013) ("[A]lleging a hypothetical chance that a consumer might think for an instant that two products come from the same source is simply not enough."); *see also* 4 J. Thomas McCarthy, *McCarthy on Trademarks* § 23:6. ("[I]nitial interest confusion is not assumed and must be proven by the evidence.").    Accordingly, courts require evidentiary proof that initial interest confusion is likely to occur.  *E.g., Vail Assocs., Inc. v. Vend-Tel-Co.*, 516 F.3d 853, 872 (10th Cir. 2008) ("[A] court cannot simply assume a likelihood of initial

12

interest confusion, even if it suspects it. The proponent of such a theory must prove it.").[13]

The majority here did not hold MTM to its evidentiary burden, but instead allowed speculation to substitute for proof. Unlike the plaintiff in *Playboy*, which presented a consumer survey showing between 20 and 50% confusion, 354 F.3d at 1026, MTM presented no confusion survey or any other "colorable evidence of actual confusion," ADD 19; *Multi Time Mach., Inc. v. Amazon.com*, 926 F. Supp. 2d 1130, 1142 (C.D. Cal. 2013). Nonetheless, the majority concluded that:

- "A jury ***could*** infer that users . . . are confused as to why MTM products are not listed." ADD 11.

- "[A] customer ***might*** think that MTM and Luminox are manufactured by the same parent company." ADD 12.

- "A jury ***could*** infer that users . . . will wonder whether a competitor has acquired MTM or is otherwise affiliated with or approved by MTM." ADD 11.

The majority based these possibilities on its own observations about corporate affiliations, ADD 17, and the conclusory declaration and report of MTM's "expert," which identified no experience or other qualifications in evaluating either consumer perception of search results or "typical" searches on

---

[13]   *Accord Suntree Techs., Inc. v. Ecosense Int'l, Inc.*, 693 F.3d 1338, 1347 (11th Cir. 2012); *Sensient Techs.*, 613 F.3d at 766; *Checkpoint Sys., Inc. v. Check Point Software Techs., Inc.*, 269 F.3d 270, 292 (3d Cir. 2001); *EarthCam, Inc. v. OxBlue Corp.*, 49 F. Supp. 3d 1210, 1241 (N.D. Ga. 2014); *Gen. Steel Domestic Sales, LLC v. Chumley*, 2013 WL 1900562, at *10 (D. Colo. May 7, 2013).

Amazon and other retail websites, ADD 11-12; Expert Report by Alex Markson, No. 11-cv-09076, Dkt. 50-10 at 7-17. Neither such ill-founded speculation nor the majority's personal experiences with other brands trumps the evidentiary record.

Likewise, the majority excused MTM's failure to present any evidence of consumer sophistication in the relevant market simply by speculating that "[s]ome members of MTM's target demographic, men of 22-55 years of age who like military-styled, rugged products, *may not be* frequent Internet shoppers" and those "purchasers *may incorrectly believe*" that MTM and Luminox "are related companies." ADD 17 (quoting *Brookfield,* 174 F.3d at 1057). Even if this possibility had record evidence to support it, this Court has already established that "[u]nreasonable, imprudent and inexperienced web-shoppers are not relevant" to the confusion analysis. *Tabari*, 610 F.3d at 1176.

The majority further inverted the proper summary judgment burden by weighing against Amazon that it had not taken affirmative steps to dispel unproven hypothetical confusion, such as explaining to consumers how search results were generated or stating that it did not carry MTM Special Ops watches. ADD 13, 18-19. The majority does not offer Amazon (or other technology companies) any guidance on what explanation of search results would be deemed sufficient to dispel any possibility of confusion. Nor does the majority explain how Amazon should address search results that literally match "MTM Special Ops" but are not

14

listings for watches themselves, such as books about the watches. The majority's failure to cite evidence of, or consider, how its proposed modifications would alter consumer perception reveals the fundamental problem with its analysis. These are not questions for judge or jury speculation; they are issues for the plaintiff to prove. *See McCarthy* § 23:90 ("[I]t is not a question of whether the decision-maker would personally be confused, but whether the ordinary buyer in the marketplace would likely be confused.").

The majority's assessment of possible, instead of proven, confusion may have been appropriate if MTM had appealed from an opinion granting a motion to dismiss. After all, a complaint is only required to plead a plausible action. *Ashcroft v. Iqbal*, 556 U.S. 662, 663 (2009). But summary judgment requires more than plausibility; it requires a *material issue of fact* grounded in sufficient record evidence to support a verdict. Fed. R. Civ. P. 56(a). For all of its "open questions" (*see* ADD 13, 17) about potential confusion, the majority failed to account for the fact that discovery is *closed*. MTM no longer has the opportunity to prove up the evidentiary scenarios the majority speculates might exist. At this stage, MTM's failure to present actual evidence that could support a finding of likely confusion warranted summary judgment.

## III. EN BANC REVIEW IS NECESSARY TO CLARIFY THE USE IN COMMERCE REQUIREMENT

The majority concluded its opinion with a few sentences announcing a new

legal standard: "the customer-generated use of a trademark in the retail search context is a use in commerce."  ADD 21-22.  The majority cites no precedent for such a holding and Amici are unaware of any.  To the contrary, it has been held that "[t]he fact that the website exhibited (displayed back) the search phrase entered by the computer user does not transform Defendant's actions into a 'use' within the Lanham Act."  *Hamzik v. Zale Corp.*, No. 3:06-cv-1300, 2007 U.S. Dist. LEXIS 28981, at *7 (N.D.N.Y. April 19, 2007) ("Defendant cannot be held responsible for Plaintiff's own actions in typing the words 'dating ring' in the website search function.  There is no allegation that Plaintiff's trademark is displayed in any of the links to the rings offered for sale on Defendant's website.").

Amici take no position as to whether any of Amazon's actions could properly be found to constitute a use in commerce.  But the scope of the majority's expansion of "use in commerce" transcends the specific facts of this case.  Depending on the platform, consumer searches return a wide variety of content— including links to encyclopedias, news articles, social media commentary, videos, review websites, retail products, and targeted advertisements.  For many of these uses, the content creators do not use trademarks in commerce at all.  Further, search technology is moving beyond the blue link results, typical of what appeared in the late 1990s.  Results can now include photographs, videos, maps, and symbols, and they can be influenced by user history, behavior, social connections,

16

location, and other indications of interest.

Applied literally, the majority's opinion threatens to expose any technology company offering a search feature to litigation (and potentially a jury trial) every time a user conducts a search for a trademarked product, irrespective of the facts.

## CONCLUSION

Amici respectfully submit that Amazon's petition for en banc review should be granted. Amici are concerned that, if not corrected or clarified, the majority opinion would give rise to a tide of trademark lawsuits based on only a speculative possibility of confusion, which would then be allowed to survive summary judgment without any concrete evidence. If the majority opinion stands, Amici fear potential trademark liability simply because they offer search features to consumers and return clearly labeled results that are broadly responsive to consumer queries. Amici's goal is to serve their users, not to confuse them. The majority opinion frustrates those efforts.

Dated: July 30, 2015                        Respectfully submitted,

*/s/ Margret M. Caruso*
Margret M. Caruso
Carolyn Homer Thomas

QUINN EMANUEL URQUHART &
SULLIVAN, LLP

*Counsel for Amici Curiae*

17

## CERTIFICATE OF COMPLIANCE WITH RULE 32(a)

In accordance with Federal Rule of Appellate Procedure 32(a)(5), (a)(6), (a)(7)(B), and (a)(7)(C) and Ninth Circuit Rules 32-1 and 29-2(c)(2), I certify that the foregoing brief is proportionately spaced using Times New Roman 14-point font and contains 3,976 words, excluding the parts of the brief exempted by Rule 32(a)(7)(B)(iii). This count is based on the word-count feature of Microsoft Word 2013.

Dated: July 30, 2015                                  */s/ Margret M. Caruso*
                                                              Margret M. Caruso

                                                              *Counsel for Amici Curiae*

## CERTIFICATE OF SERVICE

I hereby certify that, on July 30, 2015, I caused to be electronically filed the foregoing brief with the Clerk of the Court for the U.S. Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system.  I further certify that all participants in the case are registered CM/ECF users and will be served by the appellate CM/ECF system.


*/s/ Margret M. Caruso*
Margret M. Caruso

*Counsel for Amici Curiae*