**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

| | |
|---|---|
| MULTI TIME MACHINE, INC.,<br>*Plaintiff-Appellant*,<br><br>v.<br><br>AMAZON.COM, INC.; AMAZON<br>SERVICES, LLC,<br>*Defendants-Appellees*. | No. 13-55575<br><br>D.C. No.<br>2:11-cv-09076-<br>DDP-MAN<br><br>ORDER AND<br>OPINION |

Appeal from the United States District Court
for the Central District of California
Dean D. Pregerson, District Judge, Presiding

Argued and Submitted
April 9, 2015—Pasadena, California

Opinion Filed July 6, 2015
Opinion Withdrawn and New Opinion Filed
October 21, 2015

Before: Barry G. Silverman and Carlos T. Bea, Circuit
Judges and Gordon J. Quist,[*] Senior District Judge.

---

[*] The Honorable Gordon J. Quist, Senior District Judge for the U.S.
District Court for the Western District of Michigan, sitting by designation.

Order;
Opinion by Judge Silverman;
Dissent by Judge Bea

## SUMMARY[**]

### Trademark

The panel granted a petition for panel rehearing, denied as moot a petition for rehearing en banc, withdrew its opinion, and filed a superseding opinion and dissent in an appeal from the district court's summary judgment in a trademark infringement action under the Lanham Act against online retailer Amazon.com.

Multi Time Machine, Inc., manufacturer of MTM Special Ops watches, alleged that Amazon's website infringed its trademark because of the manner in which the website responded to a shopper's search request for the watches. Affirming the district court's summary judgment in favor of Amazon, the panel held that Amazon's search results page did not create a likelihood of confusion by displaying a list of several other brands of military style watches. The panel concluded that because the page clearly labeled the name and manufacturer of each product offered for sale and even included photographs of the items, no reasonably prudent shopper accustomed to shopping online would likely be confused as to the source of the products.

---

[**] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

Dissenting, Judge Bea wrote that there was a genuine issue of material fact regarding "initial interest confusion."

## COUNSEL

Eric Levinrad (argued) and Ryan Stonerock, Wolf, Rifkin, Shapiro, Schulman, & Rabkin, LLP, Los Angeles, California; Jeffrey Cohen, Millen, White, Zelano & Branigan, P.C., Arlington, Virginia, for Plaintiff-Appellant.

Marc C. Levy (argued) and Kathryn Feiereisel, Faegre Baker Daniels LLP, Denver, Colorado, for Defendants-Appellees.

Paul Alan Levy and Scott Michelman, Public Citizen Litigation Group, Washington, D.C., for Amici Curiae Public Citizen, Inc., and Electronic Frontier Foundation.

Catherine R. Gellis, Sausalito, California; Rebecca Tushnet, Georgetown Law School, Washington, D.C., for Amicus Curiae Intellectual Property Law Professors.

Margret Caruso and Carolyn Thomas, Quinn Emanuel Urquhart & Sullivan LLP, Redwood Shores, California, for Amici Curiae Google, Inc., Pinterest, Inc., Yahoo! Inc., eBay, Inc., and Twitter, Inc.

**ORDER**

Judges Silverman and Quist have voted to grant panel rehearing. Judge Bea has voted to deny rehearing. The petition for rehearing en banc is now moot. The Opinion filed July 6, 2015, and appearing at 792 F.3d 1070 (9th Cir. 2015), is withdrawn. The Superseding Opinion and Dissent are filed contemporaneously with this order. The parties may file additional petitions for panel rehearing or rehearing en banc.

---

**OPINION**

SILVERMAN, Circuit Judge:

In the present appeal, we must decide whether the following scenario constitutes trademark infringement: A customer goes online to Amazon.com looking for a certain military-style wristwatch — specifically the "MTM Special Ops" — marketed and manufactured by Plaintiff Multi Time Machine, Inc. The customer types "mtm special ops" in the search box and presses "enter." Because Amazon does not sell the MTM Special Ops watch, what the search produces is a list, with photographs, of several other brands of military style watches that Amazon *does* carry, specifically identified by their brand names – Luminox, Chase-Durer, TAWATEC, and Modus.

MTM brought suit alleging that Amazon's response to a search for the MTM Special Ops watch on its website is trademark infringement in violation of the Lanham Act. MTM contends that Amazon's search results page creates a

likelihood of confusion, even though there is no evidence of any actual confusion and even though the other brands are clearly identified by name. The district court granted summary judgment in favor of Amazon, and MTM now appeals.

We affirm. "The core element of trademark infringement" is whether the defendant's conduct "is likely to confuse customers about the source of the products." *E. & J. Gallo Winery v. Gallo Cattle Co.*, 967 F.2d 1280, 1290 (9th Cir. 1992). Because Amazon's search results page clearly labels the name and manufacturer of each product offered for sale and even includes photographs of the items, no reasonably prudent consumer accustomed to shopping online would likely be confused as to the source of the products. Thus, summary judgment of MTM's trademark claims was proper.

## I.   Factual and Procedural Background

MTM manufactures and markets watches under various brand names including MTM, MTM Special Ops, and MTM Military Ops. MTM holds the federally registered trademark "MTM Special Ops" for timepieces. MTM sells its watches directly to its customers and through various retailers. To cultivate and maintain an image as a high-end, exclusive brand, MTM does not sell its watches through Amazon.com. Further, MTM does not authorize its distributors, whose agreements require them to seek MTM's permission to sell MTM's products anywhere but their own retail sites, to sell MTM watches on Amazon.com. Therefore, MTM watches have never been available for sale on Amazon.com.

Amazon is an online retailer that purports to offer "Earth's Biggest Selection of products." Amazon has designed its website to enable millions of unique products to be sold by both Amazon and third party sellers across dozens of product categories.

Consumers who wish to shop for products on Amazon's website can utilize Amazon's search function. The search function enables consumers to navigate Amazon.com's large marketplace by providing consumers with relevant results in response to the consumer's query. In order to provide search results in which the consumer is most likely to be interested, Amazon's search function does not simply match the words in the user's query to words in a document, such as a product description in Amazon.com's catalog. Rather, Amazon's search function – like general purpose web search engines such as Google or Bing – employs a variety of techniques, including some that rely on user behavior, to produce relevant results. By going beyond exactly matching a user's query to text describing a product, Amazon's search function can provide consumers with relevant results that would otherwise be overlooked.

Consumers who go onto Amazon.com and search for the term "mtm special ops" are directed to a search results page. On the search results page, the search query used — here, "mtm special ops" — is displayed twice: in the search query box and directly below the search query box in what is termed a "breadcrumb." The breadcrumb displays the original query, "mtm special ops," in quotation marks to provide a trail for the consumer to follow back to the original search. Directly below the breadcrumb, is a "Related Searches" field, which provides the consumer with alternative search queries in case the consumer is dissatisfied with the

results of the original search. Here, the Related Search that is suggested to the consumer is: "mtm special ops watch." Directly below the "Related Searches" field is a gray bar containing the text "Showing 10 Results." Then, directly below the gray bar is Amazon's product listings. The gray bar separates the product listings from the breadcrumb and the "Related Searches" field. The particular search results page at issue is displayed below:

8      MULTI TIME MACHINE V. AMAZON.COM

Case: 13-55575, 11/26/2013, ID: 8878836, DktEntry: 17-2, Page 13 of 37



-10-

MTM watches are not listed on the page for the simple reason that neither Amazon nor MTM sells MTM watches on Amazon.

MTM filed a complaint against Amazon, alleging that Amazon's search results page infringes MTM's trademarks in violation of the Lanham Act.  Amazon filed a motion for summary judgment, arguing that (1) it is not using MTM's mark in commerce and (2) there is no likelihood of consumer confusion.   In ruling on Amazon's motion for summary judgment, the district court declined to resolve the issue of whether Amazon is using MTM's mark in commerce, and, instead, addressed the issue of likelihood of confusion.  In evaluating likelihood of confusion, the district court utilized the eight-factor test set forth in *AMF Inc. v. Sleekcraft Boats*, 599 F.2d 341 (9th Cir. 1979).[1]  Relying on our recent decision in *Network Automation, Inc. v. Advanced Systems Concepts*, 638 F.3d 1137 (9th Cir. 2011), the district court focused in particular on the following factors: (1) the strength of MTM's mark; (2) the evidence of actual confusion and the evidence of no confusion; (3) the type of goods and degree of care likely to be exercised by the purchaser; and (4) the appearance of the product listings and the surrounding context on the screen displaying the results page.  Upon reviewing the factors, the district court concluded that the relevant *Sleekcraft* factors established "that there is no likelihood of confusion in Amazon's use of MTM's

---

[1] The eight factors enumerated in *Sleekcraft* are as follows:  "1. strength of the mark; 2. proximity of the goods; 3. similarity of the marks; 4. evidence of actual confusion; 5. marketing channels used; 6. type of goods and the degree of care likely to be exercised by the purchaser; 7. defendant's intent in selecting the mark; and 8. likelihood of expansion of the product lines."  599 F.2d at 348–49.

trademarks in its search engine or display of search results." Therefore, the district court granted Amazon's motion for summary judgment.

## II.  Jurisdiction and Standard of Review

We have jurisdiction pursuant to 28 U.S.C. § 1291.

"The decision to grant summary judgment in a trademark infringement claim is reviewed *de novo*, and all reasonable inferences are to be drawn in favor of the non-moving party." *Surfvivor Media, Inc. v. Survivor Prods.*, 406 F.3d 625, 630 (9th Cir. 2005). "Although disfavored in trademark infringement cases, summary judgment may be entered when no genuine issue of material fact exists." *Id.* Indeed, in several trademark cases, we have concluded that there is no likelihood of confusion as a matter of law and affirmed the district court's grant of summary judgment in favor of the defendant. *See, e.g.*, *One Indus., LLC v. Jim O'Neal Distrib.*, 578 F.3d 1154, 1162–65 (9th Cir. 2009); *M2 Software, Inc. v. Madacy Entm't*, 421 F.3d 1073, 1080–85 (9th Cir. 2005); *Surfvivor Media*, 406 F.3d at 631–34.

## III.   Discussion

To prevail on a claim of trademark infringement under the Lanham Act, "a trademark holder must show that the defendant's use of its trademark 'is likely to cause confusion, or to cause mistake, or to deceive.'" *Fortune Dynamic, Inc. v. Victoria's Secret Stores Brand Mgmt.*, 618 F.3d 1025, 1030 (9th Cir. 2010) (quoting 15 U.S.C. § 1125(a)(1)–(a)(1)(A)). "The test for likelihood of confusion is whether a 'reasonably prudent consumer' in the marketplace is likely to be confused as to the origin of the good or service bearing one of the

marks." *Dreamwerks Prod. Group v. SKG Studio*, 142 F.3d 1127, 1129 (9th Cir. 1998). "The confusion must 'be probable, not simply a possibility.'" *Murray v. Cable NBC*, 86 F.3d 858, 861 (9th Cir. 1996).

Here, the district court was correct in ruling that there is no likelihood of confusion. Amazon is responding to a customer's inquiry about a brand it does not carry by doing no more than stating clearly (and showing pictures of) what brands it does carry. To whatever extent the *Sleekcraft* factors apply in a case such as this – a merchant responding to a request for a particular brand it does not sell by offering other brands clearly identified as such – the undisputed evidence shows that confusion on the part of the inquiring buyer is not at all likely. Not only are the other brands clearly labeled and accompanied by photographs, there is no evidence of actual confusion by anyone.

To analyze likelihood of confusion, we utilize the eight-factor test set forth in *Sleekcraft*. However, "[w]e have long cautioned that applying the *Sleekcraft* test is not like counting beans." *One Indus.*, 578 F.3d at 1162; *see also Network Automation, Inc. v. Advanced Sys. Concepts*, 638 F.3d 1137, 1145 (9th Cir. 2011) ("The *Sleekcraft* factors are intended as an adaptable proxy for consumer confusion, not a rote checklist."). "Some factors are much more important than others, and the relative importance of each individual factor will be case-specific." *Brookfield Commc'ns v. West Coast Entm't Corp.*, 174 F.3d 1036, 1054 (9th Cir. 1999). Moreover, the *Sleekcraft* factors are not exhaustive and other variables may come into play depending on the particular facts presented. *Network Automation*, 638 F.3d at 1145–46. This is particularly true in the Internet context. *See Brookfield*, 174 F.3d at 1054 ("We must be acutely aware of

excessive rigidity when applying the law in the Internet context; emerging technologies require a flexible approach."). Indeed, in evaluating claims of trademark infringement in cases involving Internet search engines, we have found particularly important an additional factor that is outside of the eight-factor *Sleekcraft* test: "the labeling and appearance of the advertisements and the surrounding context on the screen displaying the results page." *Network Automation*, 638 F.3d at 1154.

In the present case, the eight-factor *Sleekcraft* test is not particularly apt. This is not surprising as the *Sleekcraft* test was developed for a different problem — i.e., for analyzing whether two competing brands' *marks* are sufficiently similar to cause consumer confusion. *See Sleekcraft*, 599 F.2d at 348. Although the present case involves *brands* that compete with MTM, such as Luminox, Chase-Durer, TAWATEC, and Modus, MTM does not contend that the *marks* for these competing brands are similar to its trademarks. Rather, MTM argues that the design of Amazon's search results page creates a likelihood of initial interest confusion[2] because

---

[2] "Initial interest confusion is customer confusion that creates initial interest in a competitor's product. Although dispelled before an actual sale occurs, initial interest confusion impermissibly capitalizes on the goodwill associated with a mark and is therefore actionable trademark infringement." *Playboy Enters. v. Netscape Commc'ns. Corp.*, 354 F.3d 1020, 1025 (9th Cir. 2004).

Following the issuance of the original opinion in this action, several amici filed briefs questioning the validity of the doctrine of initial interest confusion in the context of the Internet. However, in the present appeal, the parties did not dispute the application of the doctrine of initial interest confusion, and we as a three-judge panel are bound by the precedent of our court. *See Miller v. Gammie*, 335 F.3d 889, 899 (9th Cir. 2003) ("[A] three-judge panel may not overrule a prior decision of the court.").

when a customer searches for MTM Special Ops watches on Amazon.com, the search results page displays the search term used – here, "mtm special ops" – followed by a display of numerous watches manufactured by MTM's competitors and offered for sale by Amazon, without explicitly informing the customer that Amazon does not carry MTM watches.

Thus, the present case focuses on a different type of confusion than was at issue in *Sleekcraft*. Here, the confusion is not caused by the design of the competitor's mark, but by the design of the web page that is displaying the competing mark and offering the competing products for sale. *Sleekcraft* aside, the ultimate test for determining likelihood of confusion is whether a "reasonably prudent consumer" in the marketplace is likely to be confused as to the origin of the goods. *Dreamwerks*, 142 F.3d at 1129. Our case can be resolved simply by a evaluation of the web page at issue and the relevant consumer. *Cf. Brookfield*, 174 F.3d at 1054 ("[I]t is often possible to reach a conclusion with respect to likelihood of confusion after considering only a subset of the factors."). Indeed, we have previously noted that "[i]n the keyword advertising context [i.e., where a user performs a search on the internet, and based on the keywords contained in the search, the resulting web page displays certain advertisements containing products or services for sale,] the 'likelihood of confusion will ultimately turn on what the consumer saw on the screen and reasonably believed, given the context.'" *Network Automation*, 638 F.3d at 1153. In other words, the case will turn on the answers to the following two questions:  (1) Who is the relevant reasonable consumer?; and (2) What would he reasonably believe based on what he saw on the screen?

14        MULTI TIME MACHINE V. AMAZON.COM

Turning to the first question, we have explained that "[t]he nature of the goods and the type of consumer is highly relevant to determining the likelihood of confusion in the keyword advertising context." *Network Automation*, 638 F.3d at 1152. "In evaluating this factor, we consider 'the typical buyer exercising ordinary caution.'" *Au-Tomotive Gold, Inc. v. Volkswagen of Am., Inc.*, 457 F.3d 1062, 1076 (9th Cir. 2006) (quoting *Sleekcraft*, 599 F.2d at 353). "Confusion is less likely where buyers exercise care and precision in their purchases, such as for expensive or sophisticated items." *Id.* Moreover, "the default degree of consumer care is becoming more heightened as the novelty of the Internet evaporates and online commerce becomes commonplace." *Network Automation*, 638 F.3d at 1152.

The goods in the present case are expensive. It is undisputed that the watches at issue sell for several hundred dollars. Therefore, the relevant consumer in the present case "is a reasonably prudent consumer accustomed to shopping online." *Toyota Motor Sales, U.S.A., Inc. v. Tabari*, 610 F.3d 1171, 1176 (9th Cir. 2010).

Turning to the second question, as MTM itself asserts, the labeling and appearance of the products for sale on Amazon's web page is the most important factor in this case. This is because we have previously noted that clear labeling can eliminate the likelihood of initial interest confusion in cases involving Internet search terms. *See, e.g.*, *Playboy Enters.*, 354 F.3d at 1030 n.44 (explaining that clear labeling "might eliminate the likelihood of initial interest confusion that exists in this case"); *Network Automation*, 638 F.3d at 1154 (same). Indeed, MTM itself argues: "The common thread of [the Ninth Circuit's decisions in *Brookfield*, *Playboy*, and *Network Automation*] is that liability under the Lanham Act can only

be avoided as a matter of law where there is clear labeling to avoid the possibility of confusion – including initial interest confusion – resulting from the use of another's trademark." Thus, MTM agrees that summary judgment of its trademark claims is appropriate if there is clear labeling that avoids likely confusion.

Here, the products at issue are clearly labeled by Amazon to avoid any likelihood of initial interest confusion by a reasonably prudent consumer accustomed to online shopping. When a shopper goes to Amazon's website and searches for a product using MTM's trademark "mtm special ops," the resulting page displays several products, all of which are clearly labeled with the product's name and manufacturer in large, bright, bold letters and includes a photograph of the item. In fact, the manufacturer's name is listed twice. For example, the first result is "**Luminox Men's 8401 Black Ops Watch** by Luminox." The second result is "**Chase-Durer Men's 246.4BB7-XL-BR Special Forces 1000XL Black Ionic-Plated Underwater Demolition Team Watch** by Chase-Durer." Because Amazon clearly labels each of the products for sale by brand name and model number accompanied by a photograph of the item, it is unreasonable to suppose that the reasonably prudent consumer accustomed to shopping online would be confused about the source of the goods.

MTM argues that initial interest confusion might occur because Amazon lists the search term used – here the trademarked phrase "mtm special ops" – three times at the top of the search page. MTM argues that because Amazon lists the search term "mtm special ops" at the top of the page, a consumer might conclude that the products displayed are types of MTM watches. But, merely looking at Amazon's

search results page shows that such consumer confusion is highly unlikely. None of these watches is labeled with the word "MTM" or the phrase "Special Ops," let alone the specific phrase "MTM Special Ops." Further, some of the products listed are not even watches. The sixth result is a book entitled "**Survive!: The Disaster, Crisis and Emergency Handbook** by Jerry Ahem." The tenth result is a book entitled "**The Moses Expedition: A Novel** by Juan Gómez-Jurado." No reasonably prudent consumer, accustomed to shopping online or not, would assume that a book entitled "The Moses Expedition" is a type of MTM watch or is in any way affiliated with MTM watches. Likewise, no reasonably prudent consumer accustomed to shopping online would view Amazon's search results page and conclude that the products offered are MTM watches. It is possible that someone, somewhere might be confused by the search results page. But, "[u]nreasonable, imprudent and inexperienced web-shoppers are not relevant." *Tabari*, 610 F.3d at 1176; *see also Network Automation*, 638 F.3d at 1153 ("[W]e expect consumers searching for expensive products online to be even more sophisticated."). To establish likelihood of confusion, MTM must show that confusion is *likely*, not just *possible*. *See Murray*, 86 F.3d at 861.

MTM argues that in order to eliminate the likelihood of confusion, Amazon must change its search results page so that it explains to customers that it does not offer MTM watches for sale before suggesting alternative watches to the customer. We disagree. The search results page makes clear to anyone who can read English that Amazon carries only the brands that are clearly and explicitly listed on the web page. The search results page is unambiguous – not unlike when someone walks into a diner, asks for a Coke, and is told "No

Coke. Pepsi." *See Multi Time Mach., Inc. v. Amazon.com, Inc.*, 792 F.3d 1070, 1080–81 (9th Cir. 2015) (Silverman, J., dissenting).

In light of the clear labeling Amazon uses on its search results page, no reasonable trier of fact could conclude that Amazon's search results page would likely confuse a reasonably prudent consumer accustomed to shopping online as to the source of the goods being offered. *Cf. Playboy*, 354 F.3d at 1030 n.44 (Clear labeling "might eliminate the likelihood of initial interest confusion that exists in this case."); *Network Automation*, 638 F.3d at 1154 (same). As Judge Berzon put it, "I do not think it is reasonable to find initial interest confusion when a consumer is never confused as to source or affiliation, but instead knows, or should know, from the outset that a product or web link is not related to that of the trademark holder because the list produced by the search engine so informs him." *Playboy*, 354 F.3d at 1034–35 (9th Cir. 2004) (Berzon, J., concurring).

MTM attempts to argue that summary judgment of its claims is inappropriate because there are numerous factual disputes related to Amazon's search results page. But, to the extent there are factual disputes between the parties, none is material to the analysis. MTM cannot dispute the fact that the watches at issue sell for hundreds of dollars. Therefore, as a matter of law, the relevant consumer would be a reasonably prudent consumer accustomed to shopping online. *See Tabari*, 610 F.3d at 1176; *Network Automation*, 638 F.3d at 1152–53. Further, MTM cannot dispute the contents of the web page at issue. A review of Amazon's web page shows that each product listed for sale is clearly labeled with the product's name and manufacturer and a photograph, and no product is labeled with MTM's mark. Thus, the undisputed

facts show that it is highly unlikely that a reasonably prudent consumer accustomed to shopping online would be confused as to the source of the goods offered for sale on Amazon's web page.

The likelihood of confusion is often a question of fact, but not always. In a case such as this, where a court can conclude that the consumer confusion alleged by the trademark holder is highly unlikely by simply reviewing the product listing/advertisement at issue, summary judgment is appropriate. *Cf. M2 Software*, 421 F.3d at 1085 (explaining that summary judgment of a trademark claim is appropriate where the plaintiff has failed to present "sufficient evidence to permit a rational trier of fact to find that confusion is 'probable,' not merely 'possible'"). Indeed, in the similar context of evaluating claims of consumer deception when dealing with false advertising claims, we have at least twice concluded – after a review of the label or advertisement at issue – that there was no likelihood of consumer deception as a matter of law because no reasonable consumer could have been deceived by the label/advertisement at issue in the manner alleged by the plaintiff. *See, e.g.*, *Davis v. HSBC Bank*, 691 F.3d 1152, 1162 (9th Cir. 2012); *Freeman v. Time, Inc.*, 68 F.3d 285, 289–90 (9th Cir. 1995).

Further, we are able to conclude that summary judgment is appropriate in the present case without delving into any factors other than: (1) the type of goods and the degree of care likely to be exercised by the purchaser; and (2) the labeling and appearance of the products for sale and the surrounding context on the screen displaying the results page. *Cf. Brookfield*, 174 F.3d at 1054 ("[I]t is often possible to reach a conclusion with respect to likelihood of confusion after considering only a subset of the factors"). However, if

we were to evaluate each of the remaining *Sleekcraft factors*, those factors would not change our conclusion, here, because those factors are either neutral or unimportant.

"Actual confusion" – We have held that "[a] showing of actual confusion among significant numbers of consumers provides strong support for the likelihood of confusion." *Playboy*, 354 F.3d at 1026 (noting that a strong showing by the plaintiff in regard to this factor alone can reverse a grant of summary judgment). However, here, there is no evidence of actual confusion. The only "evidence" MTM presented to the district court of actual confusion is the deposition testimony of MTM's president stating that someone named Eric told him, in reference to Amazon's web page, "it's confusing." Hearsay problems aside, this testimony is too speculative to show actual confusion because there is no evidence showing that Eric was a potential consumer. Indeed, at oral argument, MTM conceded that it does not have evidence of actual consumer confusion. Therefore, this factor does not weigh in MTM's favor.

"Defendant's Intent" – We have also held that "[a] defendant's intent to confuse constitutes probative evidence of likely confusion: Courts assume that the defendant's intentions were carried out successfully." *Playboy*, 354 F.3d at 1028 (footnote omitted). MTM argues that the design of Amazon's search results page is evidence of its intent to cause confusion. The design, however, indisputably produces results that are clearly labeled as to the type of product and brand. Amazon has designed its results page to alleviate any possible confusion about the source of the products by clearly labeling each of its products with the product's name and manufacturer. Therefore, this factor also does not weigh in MTM's favor.

"Strength of the Mark" – MTM argues that it has presented sufficient evidence below from which a jury could properly conclude that its trademark is both conceptually strong and commercially strong. However, we find that this factor is unimportant under the circumstances of this case. Even assuming MTM's mark is one of the strongest in the world – on the same level as Apple, Coke, Disney, or McDonald's – there is still no likelihood of confusion because Amazon clearly labels the source of the products it offers for sale.

Further, as we previously found in *Network Automation*, the remaining *Sleekcraft* factors are unimportant in a case, such as this, involving Internet search terms where the competing products are clearly labeled and the relevant consumer would exercise a high degree of care. *See Network Automation*, 638 F.3d at 1150–53 (finding "proximity of goods," "similarity of marks," "marketing channels," and "likelihood of expansion" to be unimportant in a trademark case involving Internet search terms where the advertisements are clearly labeled and the relevant consumers would exercise a high degree of care).

## IV.    Conclusion

In light of Amazon's clear labeling of the products it carries, by brand name and model, accompanied by a photograph of the item, no rational trier of fact could find that a reasonably prudent consumer accustomed to shopping online would likely be confused by the Amazon search results. Accordingly, we affirm the district court's grant of summary judgment in favor of Amazon.

**AFFIRMED.**

BEA, Circuit Judge, dissenting:

Today the panel holds that when it comes to internet commerce, judges, not jurors, decide what labeling may confuse shoppers.  In so doing, the court departs from our own trademark precedent and from our summary judgment jurisprudence. Because I believe that an Amazon shopper seeking an MTM watch might well initially think that the watches Amazon offers for sale when he searches "MTM Special Ops" are affiliated with MTM, I must dissent.

If her brother mentioned MTM Special Ops watches, a frequent internet shopper might try to purchase one for him through her usual internet retail sites, perhaps Overstock.com, Buy.com, and Amazon.com.[1]  At Overstock's site, if she typed "MTM special ops," the site would respond "Sorry, your search: 'mtm special ops' returned no results." Similarly, at Buy.com, she would be informed "0 results found.  Sorry.  Your search for **mtm special ops** did not return an exact match.  Please try your search again."

Things are a little different over at "Earth's most customer-centric company," as Amazon styles itself.  There, if she were to enter "MTM Special Ops" as her search request on the Amazon website, Amazon would respond with its page showing (1) MTM Special Ops in the search field (2) "MTM Specials Ops" again—in quotation marks—immediately below the search field and (3) yet again in the phrase "Related Searches: *MTM special ops watch,*" (emphasis in original) all before stating "Showing 10 Results."  What the website's response will not state is the truth recognized by its competitors: that Amazon does not carry MTM products any

---

[1] MTM sells its products only through its own approved distributors.

more than do Overstock.com or Buy.com. Rather, below the search field, and below the second and third mentions of "MTM Special Ops" noted above, the site will display aesthetically similar, multi-function watches manufactured by MTM's competitors. The shopper will see that Luminox and Chase-Durer watches are offered for sale, in response to her MTM query.[2]

MTM asserts the shopper might be confused into thinking a relationship exists between Luminox and MTM; she may think that MTM was acquired by Luminox, or that MTM manufactures component parts of Luminox watches, for instance. As a result of this initial confusion, MTM asserts, she might look into buying a Luminox watch, rather than junk the quest altogether and seek to buy an MTM watch elsewhere. MTM asserts that Amazon's use of MTM's trademarked name is likely to confuse buyers, who may ultimately buy a competitor's goods.

MTM may be mistaken. But whether MTM is mistaken is a question that requires a factual determination, one this court does not have authority to make.

---

[2] As of June 17, 2015, the shopper might be subject to even more confusion if she began her search of Amazon's wares through Google. If she searched Google for "Amazon MTM special ops watch," one of the search results would be a static page on Amazon's website. Amazon's static webpage stated that "At Amazon.com, we not only have a large collection of mtm special ops watch products [which, of course, is flatly untrue], but also a comprehensive set of reviews from our customers. Below we've selected a subset of mtm special ops watch products [a repetition of the untruth] and the corresponding reviews to help you do better research, and choose the product that best suits your needs." Amazon, http://www.amazon.com/gp/feature.html?ie=UTF8&docId=1001909381. Amazon has since removed the page.

By usurping the jury function, the majority today makes new trademark law. When we allow a jury to determine whether there is a likelihood of confusion, as I would, we do not *make* trademark law, because we announce no new principle by which to adjudicate trademark disputes. Today's brief majority opinion accomplishes a great deal: the majority announces a new rule of law, resolves whether "clear labeling" favors Amazon using its own judgment, and, sub silentio, overrules this court's "initial interest confusion" doctrine.

Capturing initial consumer attention has been recognized by our court to be a grounds for finding of infringement of the Lanham Act since 1997. *Dr. Seuss Enterprises, L.P. v. Penguin Books USA, Inc*., 109 F.3d 1394, 1405 (9th Cir. 1997) (identifying "initial consumer attention" as a basis for infringement). In 1999, citing *Dr. Seuss*, we expressly adopted the initial interest confusion doctrine in the internet context, and never repudiated it. *Brookfield Communications, Inc. v. West Coast Entertainment Corp.*, 174 F.3d 1036, 1062 (9th Cir. 1999). It may not apply where the competing goods or services are "clearly labeled" such that they cause only mere diversion, but whether such goods or services are clearly labeled so as to prevent a prudent internet shopper's initial confusion depends on the overall function and presentation of the web page. The issue is whether a prudent internet shopper who made the search request and saw the Amazon result—top to bottom—would more likely than not be affected by that "initial interest confusion." That is, an impression—when first shown the results of the requested MTM Special Ops search—that Amazon carries watches that have some connection to MTM, and that those watches are sold under the name Luminox or Chase-Durer. Whether there is likelihood of such initial interest confusion, I submit, is a

jury question.  Intimations in our case law that initial interest confusion is bad doctrine notwithstanding, it is the law of our circuit, and, I submit, the most fair reading of the Lanham Act.

Tellingly, the majority does not cite to the statutory text, which provides that the nonconsensual use of a registered trademark will infringe where "such use is likely to cause confusion, or cause mistake, or deceive."  15 U.S.C. § 1114(1)(a).  The majority reads the statute to contain language that it does not, essentially reading the clause "at point of sale" into the end of § 1114(1)(a).  Similarly, the majority reads 15 U.S.C. § 1125 to apply only at point of sale—the majority writes that it is unreasonable to suppose that a reasonably prudent consumer accustomed to shopping online would be confused about the source of the goods where Luminox and Chase-Durer watches are labeled as such, but does not address the possibility that a reasonably prudent consumer might initially assume that those brands enjoyed some affiliation with MTM which, in turn, could cause such a shopper to investigate brands which otherwise would not have been of interest to her.[3]

To reach its conclusion, the majority purports to apply this court's precedent in *Network Automation, Inc. v. Advanced Systems Concepts, Inc.*, 638 F.3d 1137, 1145 (9th Cir. 2011).  In so doing, the majority ignores the procedural

---

[3] Any person who "uses in commerce any word, term, name, symbol, or device . . . which is likely to cause confusion . . . as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services of commercial activities" is also subject to injunction and liable for damages to one likely to be damaged.  15 U.S.C. § 1125(a)(1).

posture of that case. There, plaintiff Network Automation and defendant Advanced Systems Concepts both sold job scheduling and management software. *Id*. at 1142. Network Automation advertised its product by purchasing certain keywords—including registered trademarks belonging to Advanced Systems—which, when typed into various search engines, included Network Automation's website "www.NetworkAutomation.com" as a labeled, sponsored link among the search results. *Id*. Advanced Systems alleged violation of the Lanham Act and moved for a preliminary injunction. *Id*. at 1143. The district court granted a preliminary injunction to Advanced Systems, and Network Automation appealed. *Id*. On appeal, this court reversed and vacated the preliminary injunction.

To do so, this court did *not* find that there was no genuine issue of fact as to likelihood of confusion. Instead, this court properly considered whether the facts, as the court understood them, favored Advanced Systems in *Network Automation* because a preliminary injunction requires "the moving party [there, the plaintiff alleging infringement] demonstrate a fair chance of success on the merits or questions serious enough to require litigation." *Arc of California v. Douglas*, 757 F.3d 975, 993 (9th Cir. 2014). Therefore, the *Network Automation* court properly considered the weight of the evidence to decide whether Advanced Systems had a fair chance of success on the merits. Here, we are not tasked to determine whether MTM is likely to succeed, nor to consider the weight of the evidence. As this is an appeal from a summary judgment, we must decide whether the non-moving party (MTM) tendered a genuine issue of fact. *Network Automation* did not announce a rule that clear labeling is per se a question of law, nor that a judge's determination that

products are clearly labeled precludes a triable issue of fact as to trademark infringement.

Indeed, even if *Network Automation* were not so readily distinguishable by its procedural posture, it is factually distinguishable. In *Network Automation*, the "diversionary" goods were clearly labeled on the response page as "Sponsored Links," showing that the producers of those products were the ones advertising for themselves, not for the firm named in the search request. *Network Automation*, 638 F.3d at 1144. Unlike the sponsored links at issue in *Network Automation*, and unlike its competitors Buy.com and Overstock.com, Amazon does not forestall any confusion by informing customers who are searching "MTM Special Ops" that Amazon does not carry any such products. Amazon does just the opposite. It responds by twice naming MTM, and once specifically naming watches.

On this record, a jury could infer that users who are confused by the search results are confused as to why MTM products are not listed. There is a question of fact whether users who are confused by the search result will wonder whether a competitor has acquired MTM or is otherwise affiliated with or approved by MTM. *See Brookfield Communications*, 174 F.3d at 1057. This is especially true as to a brand like MTM, as many luxury brands with distinct marks are produced by manufacturers of lower-priced, better-known brands—just as Honda manufactures Acura automobiles but sells Acura automobiles under a distinct mark that is marketed to wealthier purchasers, and Timex manufactures watches for luxury fashion houses Versace and Salvatore Ferragamo. Like MTM, Luminox manufactures luxury watches, and a customer might think that MTM and Luminox are manufactured by the same parent company. The

possibility of initial interest confusion here is likely much higher than if, for instance, a customer using an online grocery website typed "Coke" and only Pepsi products were returned as results.  No shopper would think that Pepsi was simply a higher end version of Coke, or that Pepsi had acquired Coke's secret recipe and started selling it under the Pepsi mark.

In any event, even as to expensive goods—for instance, pianos sold under a mark very similar to the famous Steinway and Sons brand's mark—the issue is not that a buyer might buy a piano manufactured by someone other than Steinway thinking that it was a Steinway.  The issue is that the defendant's use of the mark would cause initial interest confusion by attracting potential customers' attention to buy the infringing goods because of the trademark holder's hard-won reputation.  *Brookfield*, 174 F.3d at 1063 (citing *Grotrarian, Helfferich, Schulz, Th. Steinweg Nachf. v. Steinway & Sons*, 523 F.2d 1331, 1341–42 (2d. Cir. 1975)).

A jury could infer that the labeling of the search results, and Amazon's failure to notify customers that it does not have results that match MTM's mark, give rise to initial interest confusion.  If so, a jury could find that Amazon customers searching for MTM products are subject to more than mere diversion, since MTM is not required to show that customers are likely to be confused at the point of sale. *Playboy Enterprises, Inc. v. Netscape Communications Corp.*, 354 F.3d 1020, 1025 (9th Cir. 2004).

Assuming arguendo that the majority properly found that Amazon's search results are clearly labeled, the majority extends its factual determinations further by determining that in this case, clear labeling outweighs the other eight factors

considered in trademark suits, factors that remain the law of this circuit: (1) strength of the mark(s); (2) proximity or relatedness of the goods; (3) similarity of the marks; (4) evidence of actual confusion; (5) marketing channels; (6) degree of consumer care; (7) the defendants' intent; and (8) likelihood of expansion. *Network Automation*, 638 F.3d at 1145 (citing *AMF v. Sleekcraft Boats*, 599 F.2d 341, 348–49 (9th Cir. 1979)). To be sure, courts must be flexible in their application of the factors, as some may not apply in every case. *Playboy*, 354 F.3d at 1026. Here, for instance, the likelihood of expansion does not apply because both MTM and Amazon already sell luxury watches, so whether either is likely to expand its sales into the luxury watch market is not a question. However, where the *Sleekcraft* factors could tip in either direction, there is a jury question. *Fortune Dynamic, Inc. v. Victoria's Secret Stores Brand Management, Inc.*, 618 F.3d 1025, 1039 (9th Cir. 2010). Simply stating that the *Sleekcraft* factors do not favor the plaintiff, or don't bear on the clarity of the labeling, does not resolve the underlying factual question.

Having exercised its own judgment to determine that this presentation is not confusing, the majority purports to consider the *Sleekcraft* factors, though the opinion essentially states that some of the factors are *per se* irrelevant—for instance, as to the *Sleekcraft* factor, "strength of the mark," the majority assert that "under the circumstances of this case," the factor is unimportant because "Amazon clearly labels the source of the products it offers for sale." Slip op. at 20. By reiterating the conclusion at which it had already arrived, the majority ignores the factor and the fact-intensive analysis it entails. A mark's strength is a measure of how uniquely identified it is with a product or service, and therefore how deserving of trademark protection. *Fortune*

*Dynamic*, 618 F.3d at 1032. "A mark's conceptual strength depends largely on the obviousness of its connection to the good or service to which it refers. The less obvious the connection, the stronger the mark, and vice versa." *Id*. at 1032. Conceptual strength is considered along a continuum, and in this circuit, marks may be classified as falling into one of five categories, from conceptually weak to conceptually strong: generic, descriptive, suggestive, arbitrary, or fanciful. *Fortune Dynamic*, 618 F.3d at 1033. Whether a mark is descriptive or suggestive is a question of fact. *Id*. at 1034. In an infringement suit, "the distinction [between a descriptive and suggestive mark] is important because if the mark is suggestive, there is a stronger likelihood that the 'strength of the mark' factor favors the [plaintiff]." *Id.* Here, the phrase "MTM Special Ops" requires "a mental leap from the mark to the product," because the phrase does not expressly refer to watches. *Fortune Dynamic*, 618 F.3d at 1033. Indeed, by evoking elite military forces ("Special Ops"), the goods suggested by the phrase are as likely to be protective gear, binoculars, weapons, or boots as they are watches. A jury could find that the mark is suggestive and conceptually strong because it does not obviously refer to watches, or that it is merely descriptive because the watches are made in a military style. Either way, the weight of the evidence is a question of fact, and there is a genuine issue of fact as to the conceptual strength of the mark. As in *Fortune Dynamic*, "a jury should assess the conceptual strength of [plaintiff's] mark in the first instance." 618 F.3d at 1033. However, the majority simply brushes off the question as irrelevant "under the circumstances." The circumstances surrounding the case are questions of fact, not law, and should be given to a jury to determine.

Similarly, the majority finds that Amazon's intent weighs in favor of Amazon. A defendant's intent is relevant because a "defendant's intent to confuse constitutes probative evidence of likely confusion." *Playboy*, 354 F.3d at 1029. MTM submitted evidence that Amazon vendors and customers had complained to Amazon because they did not understand why they received certain non-responsive search results when they searched for products that are not carried by Amazon. The evidence showed that Amazon employees did not take action to address the complaints by explaining to the public how its search function works.[4] One Amazon employee noted that explaining BBS to the public might draw customers' and vendors' unwanted scrutiny to the matter. Amazon did not disclose to shoppers that its search function responds to customer behavior.

As in *Playboy*, this evidence suggests, "at a minimum, that defendants do nothing to alleviate confusion . . . Although not definitive, this factor provides some evidence of an intent to confuse on the part of defendants." *Playboy*,

---

[4] Amazon's search algorithm responds to its customers' behavior using a Behavior Based Search ("BBS") technology, which uses data about what customers view and purchase after searching certain terms. Amazon does not program the terms; the function responds solely to customer behavior. If enough customers search for a certain keyword, "X," and then look at or purchase another product "Y," even if X and Y are not obviously related, future customers who search for X may receive search results including Y. But the BBS function is not solely responsible for the search results. The results list also includes matches based on a search of terms on Amazon's pages—for instance, streaming video of a show called Special Ops Mission may be called up. Whether a particular result appears because of BBS or a traditional search of matching terms is not evident from the matches, and the relevant products (which are based on search terms) and recommended products (based on BBS) are mingled together.

354 F.3d at 1029. From evidence that "Earth's most customer-centric company" took no action on these complaints, a jury could infer that Amazon intended to confuse its customers.

The majority ignores this evidence on the basis of its conclusion that Amazon created a page with clearly labeled wares, and further concludes that Amazon must not have intended to confuse customers, or its page would not be clearly labeled. Slip op. at 19–20. However, to conclude that there is no triable issue of fact, the majority may not overlook or ignore evidence to the contrary in the record, or assume that a jury would weigh evidence the same way that the panel does.

Finally, the majority repeatedly states that not only does Amazon clearly label its products, but there is no evidence of actual confusion. Assuming arguendo that there is no evidence from which a jury could infer actual confusion,[5] the absence of actual confusion is not dispositive of whether there is a genuine issue of fact. Where evidence of actual confusion is submitted, it is "strong support for the likelihood

---

[5] Amazon submitted evidence that purports to show that no customers were confused, because customers who searched for "Luminox" were 21 times as likely to purchase a Luminox watch as were customers who searched for "MTM Special Ops." It isn't surprising that customers who search for an item (Luminox watches) are more likely to buy that item than customers who did not search for it but searched for another product (MTM watches). However, a jury might view this purported evidence of no actual confusion as flawed because a user researching watches might initially be confused about the availability of MTM watches online and so not purchase a Luminox the same day. Further, some users did search for "MTM Special Ops" and purchase a competitor's watch the same day, which a jury could find probative of some confusion.

of confusion." *Network Automation*, 638 F.3d at 1151. But actual confusion "is not necessary to a finding of likelihood of confusion under the Lanham Act. Indeed, proving actual confusion is difficult and the courts have often discounted such evidence because it was unclear or insubstantial." *Id*. A plaintiff need not show actual confusion to prevail.

Through its cursory review of the *Sleekcraft* factors and conclusory statements about clear labeling, the majority purports to apply this circuit's trademark law, and ignores the doctrine of initial interest confusion. In so doing, the majority today writes new trademark law and blurs the line between innovation and infringement.

More troubling, the majority ignores the role of the jury. Summary judgment law is an aid to judicial economy, but it can be so only to the extent that it comports with the Seventh Amendment. Were we to reverse and remand, MTM might well lose. The likelihood of that outcome is irrelevant to the question whether there is a genuine issue of fact. I respectfully dissent.